2005 VT 69

## Candace A. Willard, et al. v. Parsons Hill Partnership, et al.

## Brent E. Poulin, et al. v. Parsons Hill Partnership, et al.

[882 A.2d 1213]

Nos. 03-494 and 03-499

Present: **Dooley, Johnson and Skoglund, JJ., and Reiss, D.J., and Gibson, J. (Ret.), Specially Assigned**

Opinion Filed August 5, 2005

*John Paul Faignant* of *Miller Faignant & Behrens, P.C.*, Rutland, for Plaintiffs-Appellants Willard, et al. and Cross-Appellee Taggart Brothers, Inc. (03-494).

*John J. Welch, Jr.* of *John J. Welch, Ltd.*, Rutland, for Plaintiffs-Appellants Poulin, et al. (03-499).

*Robert A. Mello* of *Robert A. Mello & Associates, PLC*, South Burlington, for Defendants-Appellees.

¶ 1. **Johnson, J.** Plaintiffs sue their landlord and others for damages, alleging a knowing and willful breach of the common-law warranty of habitability. Plaintiffs claim that landlord knowingly supplied its tenants with water containing levels of toxins well in excess of public health standards for approximately fourteen years. Plaintiffs further allege that, despite a "Do Not Drink" order issued by the Department of Health, defendants took no action to notify tenants of the problem, or to fix it. Defendants moved for summary judgment, arguing that plaintiffs' claims under the common law were preempted by statute, and that, notwithstanding plaintiffs' allegation of lack of knowledge, plaintiffs could not satisfy the elements of the statutory cause of action because no tenants had notified landlord of the breach. To the extent that there was notification, defendants argued that the water system was fixed in a timely manner following receipt of the written notice from some of the tenants. In addition, the individual partners of the landlord argued that they were not proper parties to plaintiffs' suit. Defendants also cross-claimed against a contractor under an express indemnity agreement related to work the contractor performed on the water system that was eventually identified as the source of the contamination. The trial court granted summary judgment for all defendants, and dismissed defendants' cross-claim. We reverse and remand on plaintiffs' claim under the common law, and hold that it is not preempted by a statute that is addressed solely to patent defects that tenants are capable of discovering. We affirm the trial court's judgment on the cross-claim.

¶ 2. In 1982, a group of individuals formed defendant Parsons Hill Partnership, a limited partnership organized under Vermont law, for the purposes of developing low-income family housing in Castleton, Vermont. Yvonne Rooney was named the general partner. Later that year, the partnership obtained state approval to construct the project and to operate a water system to provide water to the housing units.

¶ 3. Vermont Department of Health water tests conducted at the project in early 1983 revealed that the water contained unsafe levels of Perchloroethylene (PCE) — a known toxin. The tests showed PCE levels at 790 parts per billion (ppb) — levels well in excess of the Environmental Protection Agency's maximum contaminant level of 20 ppb. Based on these results, the Department of Health assigned the water "No Drink" status. After being notified verbally, Yvonne Rooney received written confirmation of these results from the state.

The letter requested that the tenants be notified of the water's unsafe status. Despite this request, tenants allege that neither Yvonne Rooney nor anyone associated with or employed by the partnership took any action to warn the tenants or to furnish them with uncontaminated water prior to August 1997.

¶ 4. Tenants contend that they drank, bathed in, cooked with, and cleaned with the PCE-contaminated water for fourteen years until one of them inadvertently learned of the problem in July 1997. While conducting internet research as part of her employment, tenant Candace Willard discovered information on a state web site indicating that the water at Parsons Hill was contaminated with PCE. After doing further research on the potentially dire health consequences associated with PCE exposure, Willard informed other tenants of her findings and they hired a consultant and an attorney.

¶ 5. On August 11, 1997, counsel for eight tenant families sent a letter to counsel for Parsons Hill Partnership to provide "notice under 9 V.S.A. Section 4458 that Parsons Hill Partnership and Yvonne Rooney are in breach of their obligations for habitability with regard to the water at the Parsons Hill apartments." Section 4458 is the warranty-of-habitability enforcement provision in the Residential Rental Agreements Act.[1] Apparently in response to the tenants' concerns, the state brought a temporary water system to Parsons Hill to provide the tenants with contaminant-free drinking and cooking water.

¶ 6. The following month, the eight tenant families who sent the partnership notice under the statute, along with a number of other tenant families, filed a complaint for damages against various individual partners, corporations, and the partnership. Among other things, their complaint alleged that the partnership violated the common-law warranty of habitability by failing to remedy the water contamination within a reasonable time after first receiving the state's notice describing the problem in 1983. Despite having referenced the statute in their notice letter, the tenants did not assert a statutory claim. Specifically, they alleged that the water contamination that the partnership

---

[1] The Legislature amended § 4458(a) in 2000, providing that a tenant could commence a suit upon the inaction of a landlord who had received actual notice of noncompliance with its warranty obligations from the "tenant, a governmental entity or a qualified independent inspector." 1999, No. 115 (Adj. Sess.), § 6. Because plaintiffs filed suit in 1997, before the amendment was passed, all references to § 4458 will be to the statute as it read prior to the amendment, unless otherwise noted.

and its individual partners failed to remedy for approximately fourteen years was a habitability defect that the tenants were incapable of discovering because of its latent nature and its origin in a facility controlled and operated by the partnership.

¶ 7. Plaintiffs' complaint alleged that for fourteen years several state officials had been working with Yvonne Rooney, as well as Catherine and William Rooney — who were limited partners and were also at various times operators of the water system — to ascertain the source of the PCE contamination. Plaintiffs further allege that levels of contamination had fluctuated over that period, but had regularly exceeded safe levels. During that same period, the state sent numerous letters to, or otherwise communicated with, Yvonne, Catherine, and William Rooney informing them that tests continued to show PCE contamination in the water and reminding them that the "Do Not Drink" water advisory should remain in place until the state changed that status. Despite these directives, the tenants allege that, prior to August 1997, defendants neither notified them of the problem nor took any steps to furnish uncontaminated water to the tenants' rental units.

¶ 8. After years of investigation, the state, in conjunction with the partnership and the Rooneys, identified the PCE contamination's source as an underground storage tank that was part of the water system operated by the Rooneys. Shortly thereafter, in October 1997, the defective tank was disconnected and replaced.

¶ 9. Plaintiffs conducted extensive discovery and reached a settlement with numerous defendants on all counts except the warranty-of-habitability count against the partnership and the Rooneys. These remaining defendants then moved for summary judgment. In considering the motion, the trial court refused to recognize the viability of the tenants' common-law claim, and instead applied the statute with its tenant-notice provision, § 4458(a). Because of its decision to apply the statute, the trial court divided the otherwise similarly-situated plaintiffs into two groups: those who sent the partnership the statutory notice letter before initiating this lawsuit, and those who did not. For purposes of convenience, we will identify the notice group as the "Willards" and the nonnotice group as the "Poulins."[2]

---

[2] This is a consolidated appeal. As the Court understands it, the eight families who sent the August 1997 notice letter are all grouped under the case captioned "Candace A. Willard, et al. v. Parsons Hill Partnership, et al.," Supreme Court Docket Number 2003-494. There are, however, other plaintiff-tenants under that caption who were not party to the August letter. None of the plaintiff-tenants grouped under the case captioned "Brent

¶ 10. The trial court applied the statute to both tenant groups, concluding that the Legislature had preempted the common-law habitability remedy by passing § 4458. Notwithstanding the fact that defendants had received several written notices of the water problem from the state over a fourteen-year period, the trial court ruled that the Poulins' failure to give the partnership written notice of the alleged habitability defect pursuant to § 4458 barred their claim. The court stated that "[h]abitability issues only become relevant when the defects, patent or latent, come to light," regardless of how long the landlords had known of and failed to repair them, apparently concluding that notice from the state to the partnership was not sufficient to bring the defect "to light."

¶ 11. Even though the Willards also brought their claim under the common law, the trial court credited them for complying with the statute's notice requirement. Nonetheless, the court concluded that they could not prevail because they could not show that defendants "fail[ed] to make repairs within a reasonable time," or that the contaminated water system "materially affect[ed] the health and safety" of the tenants. The court based its conclusions on its view that the reasonable time in which defendants were required to make repairs was measured from August 1997 when the Willards gave written notice of the water defect, instead of 1983 when Yvonne Rooney received written notice of the PCE contamination from the Department of Health. The court concluded that defendants had remedied the habitability defect within a reasonable time because the undisputed facts showed that, within weeks of the Willards' letter, the state "was promptly on the scene with a . . . [water tank] for drinking and cooking water." In light of the short period between the tenants' notice letter and defendants' remedial action, the court concluded that "it cannot be said that the contaminated water system 'materially affect[ed] health and safety,'" even though plaintiffs alleged that they had been drinking PCE-contaminated water for many years.

¶ 12. We review a trial court's grant of summary judgment de novo. In so doing, we apply the same standard as the trial court, granting summary judgment if there are no genuine issues as to any material fact, and any party is entitled to summary judgment as a matter of law. V.R.C.P. 56(c)(3). Our review of legal questions presented by the motion is plenary and nondeferential.

E. Poulin, et al. v. Parsons Hill Partnership, et al.," Supreme Court Docket Number 2003-499, were party to the August notice letter.

## I. Warranty of Habitability

¶ 13. The principal issue is whether plaintiffs may rely on the common-law implied warranty of habitability we recognized in *Hilder v. St. Peter*, 144 Vt. 150, 478 A.2d 202 (1984), or whether the common law as stated therein was preempted by the Legislature's enactment of the Residential Rental Agreements Act, 9 V.S.A. §§ 4451-4468. We agree with plaintiffs that the statute as originally enacted covered only patent defects, and that to apply its notice provisions to bar plaintiffs' claim based on latent defects is illogical. Moreover, there is no evidence in the statute or legislative history that the Legislature intended to change the common-law with respect to latent defects, or to preempt that law as stated in *Hilder*.

¶ 14. In *Hilder*, we concluded that changes in the historical relationship between landlords and tenants necessitated the adoption of an implied requirement, in every residential rental agreement, that the landlord maintain premises that are at all times safe, clean, and fit for human habitation. 144 Vt. at 159, 478 A.2d at 208. We recognized that because of their greater familiarity with the rental units they own and the essential equipment attached to those units, landlords were in a superior position to discover and cure any defects that would affect the safety and fitness for human habitation of their units. *Id.* at 158, 478 A.2d at 207. We stressed that the warranty of habitability covers *all latent and patent defects* in the unit's essential facilities, i.e., those that are vital to residential life. *Id.* at 160, 478 A.2d at 208. This warranty extends to facilities that are controlled by the landlord, including those that are located in common areas. *Id.* at 160 n.2, 478 A.2d at 208 n.2.

¶ 15. Under *Hilder*, a complaining tenant has to notify the landlord of the habitability defect and allow a reasonable time for the landlord to correct it prior to suing the landlord for breach of the implied warranty. *Id.* at 161, 478 A.2d at 209. The notice requirement applies, however, only to defects "not known to the landlord." *Id.* (quotations omitted). Thus, *Hilder* permitted suits for warranty breaches resulting from unrepaired or uncorrected defects that the landlord *actually knew of*, either (1) because an affected tenant had complained to the landlord about the problem, or (2) because of the landlord's superior familiarity with, access to, or control over the essential facility where the defect existed. Plaintiffs' allegations, beginning in 1983, fit squarely into the second category.

¶ 16. In 1986, partly in response to *Hilder*, the Legislature enacted the Residential Rental Agreements Act (RRAA), 1985, No. 175 (Adj. Sess.), § 1, in which it expressed its desire to protect the state's tenant

population from unscrupulous and recalcitrant landlords, while striking a fair balance between the rights of landlords and tenants. See Hearing on H.339 Before House Judiciary Comm. 40-43, 1985 Bien. Sess. (Vt. Aug. 21, 1985) (discussing *Hilder* in the context of then-pending warranty-of-habitability legislation); see also *Vt. Tenants, Inc. v. Vt. Hous. Fin. Agency*, 170 Vt. 77, 86, 742 A.2d 745, 751 (1999) (recognizing that RRAA has both tenant-protection and landlord-protection provisions).

¶ 17. The RRAA, like the common law, implies a warranty of habitability in all residential rental agreements. 9 V.S.A. § 4457. Section 4458(a) requires the tenant to give the landlord "actual notice" of the landlord's noncompliance with its habitability obligations before resorting to the remedies provided by the statute. Actual notice is defined as written notice hand-delivered or mailed to the landlord's last known address. *Id.* § 4451(1).

¶ 18. Although the RRAA does not make any distinction between patent and latent defects, its notice provisions can be logically understood to apply only to patent defects. The notice provision plays an important role in safeguarding the landlord's rights in cases involving patent defects. These are defects that the tenant is most often in a superior position to discover because of his or her daily use and occupancy of the rented premises — especially if the habitability defect occurs inside an individual rental unit. Examples of such defects include a chronically clogged toilet, leaking or frozen pipes, vermin infestation, lack of heat, and crumbling plaster. See *Hilder*, 144 Vt. at 155-56, 478 A.2d at 206 (cataloguing defects on which tenant based successful warranty-of-habitability claim). As a practical matter, most landlords do not frequently enter occupied rental units unless they are responding to a tenant's complaint. See 9 V.S.A. § 4460 (establishing notice and consent requirements that landlord must satisfy before entering tenant's dwelling). In such cases, the landlord must often rely on notice from a tenant to learn that there is a problem that may materially affect tenant health and safety; these are the cases that present the greatest danger of abuse by dishonest tenants.

¶ 19. The statute's notice requirement is designed to ensure that a landlord is not penalized for failing to fix a problem of which landlord had no knowledge. For example, it prevents tenants from using a subsequently occurring habitability defect as an excuse for nonpayment of rent that is wholly unrelated to the defect and that began before the defect arose. See *id.* § 4458(a)(1) (allowing for withholding of rent by tenant during period of landlord's noncompliance).

¶ 20. By contrast, the provision requiring notice from the tenant serves no similarly important or logical purpose in cases involving latent defects of which the landlord had written notice from someone other than the tenant. In such cases, the statute's notice of noncompliance provision is nothing more than a notice-of-suit requirement. The trial court's attempt to apply the notice provision to this case illustrates the point. The trial court ruled that the Willards' presuit notice satisfied the statute, and their claim was not, therefore, barred on notice grounds like the Poulins' claim. The notice, sent by the Willards' attorney to the partnership's attorney, indicated that it was directed to the partnership and general partner Yvonne Rooney, stated that it was sent on behalf of eight tenant families at Parsons Hill, and requested the recipient to "accept this notice under 9 V.S.A. Section 4458 that the Parsons Hill Partnership and Yvonne Rooney are in breach of their obligations for habitability with regard to the water at the Parsons Hill apartments." The letter makes no attempt to explain the exact nature of the water problem.

¶ 21. No explanation was needed because the partnership and its general partner had known since 1983 that PCE contamination was the problem, even if the origin of the PCE was still unknown. The record here contains numerous examples of written notice of the water problem sent by the state to general partner Yvonne Rooney. Applying the notice provision, as the trial court did, in this ritualistic manner does nothing to further the statute's purpose — protecting law-abiding landlords. Similarly, imposing a notice requirement in a latent defect case where the landlord already knows what the problem is serves no purpose. Therefore, it is apparent that the law was directed only at patent defects. To construe the statute otherwise would lead to a patently absurd result.

¶ 22. The legislative debate on the habitability sections in the RRAA supports our assessment that the Legislature's focus was on patent habitability defects. After its introduction in the Vermont House of Representatives, the RRAA bill, H.339, was ultimately referred to the House Judiciary Committee. H. Jour. 208, 1985-1986 Gen. Assem., Adj. Sess. (Vt. Feb. 26, 1986). The Judiciary Committee struck all the original provisions of the bill, except for the enacting clause, and substituted its own amended version of the bill. *Id.* The section of the committee's amended bill dealing with tenant remedies in the event of habitability breaches is identical to the final version of the RRAA. Compare *id.* at 210 with 9 V.S.A. § 4458. The following exchange is a representative sample of the committee's discussion:

REP. BATTEN: [I]t would seem that after *Hilder vs. St. Peter*, many tenants are using that decision to just move in and not pay rent and claim it is because the premises are defective and the owner won't do anything about it. I wonder if there should be some burden placed on the tenant that there be some notification of the deficiency — say the heat has gone off, that that tenant should have the burden of notify[ing] the landlord prior to nonpayment of rent.

MS. ANCEL: That is required in the [*Hilder*] case. And, it's also required in the bill.

REP. BATTEN: . . . And, I think people — they haven't paid rent and the landlord starts eviction proceeding and suddenly hears about the fact that the tenant hasn't had hot water for seven months and the landlord hasn't heard this.

REP. STOKES: Then it doesn't apply, even according to the [C]ourt, the *Hilder vs. St. Peter* case. Notification is part of the process.

REP. BATTEN: So, what is the process of notification?

REP. STOKES: It just says that the tenant must notify the landlord and if the landlord does not respond in a reasonable amount of time, that's what the case says, reasonable amount of time, then the tenant may withhold rent.

Hearing on H.339 Before House Judiciary Comm. 40-41, 1985-1986 Bien. Sess. (Vt. Aug. 21, 1985). Later in the discussion, Representative Davenport, a principal author of the original version of H.339 and a member of the Judiciary Committee, added additional comments that are consistent with our appraisal of the Legislature's intent:

REP. DAVENPORT: I have to say on the issues of repair and deduction and rent withholding I have somewhat ambivalent feelings. On the one hand the same feelings that I had about the security deposit that it is important to have a process that people know about and understand about and somehow if you put that in statute that's somehow easier for people to get at and have access to then it's in the case law, which was Anne's point about people now they hear about [*Hilder v. St. Peter*] and they think it is something they could apply to their situation but they don't have access to this case. The notice provision isn't something they know about.

So, that's one of the reasons why it seemed to me initially when we were drafting this bill that there was a real value to putting some of this into statute. My feeling on the other hand is that putting it into statute does make this bill very long and does make it very cumbersome. And, that there may also be value to leave it alone in the case law having a finding that we are not dealing with that one way or the other. . . .

*Id.* at 43.

¶ 23. Ultimately, the Legislature did adopt a warranty of habitability provision that was, in virtually all respects, consistent with that part of *Hilder* that deals with patent defects known to the tenant. In fact, since the statute's enactment we have cited to *Hilder* as a guide to the statute's proper interpretation in cases involving patent habitability defects. *Favreau v. Miller*, 156 Vt. 222, 229, 591 A.2d 68, 72-73 (1991) (citing *Hilder*); *Nepveu v. Rau*, 155 Vt. 373, 375, 583 A.2d 1273, 1274 (1990) (citing *Hilder*). The committee's focus was not, however, on the aspect of *Hilder* allowing for tenant remedies in cases involving latent defects already known to the landlord. This oversight is understandable because, while the latent defect language in the case was important to the common law that we were promulgating, *Hilder* itself was a case involving patent defects.

¶ 24. We note that, in 2000, the Legislature amended 9 V.S.A. § 4458(a). 1999, No. 115 (Adj. Sess.), § 6. The statute now provides that a tenant can pursue his habitability remedies if the landlord fails to remedy a habitability defect within a reasonable time "after receiving actual notice of the noncompliance from the tenant, a governmental entity or a qualified independent inspector." 9 V.S.A. § 4458(a). With this amendment, the Legislature has now brought cases like plaintiffs' within the ambit of the statute, thus supporting our view that the former § 4458(a) did not cover the entire range of habitability claims.

¶ 25. We are not persuaded by defendants' argument that the statutory notice provision's "obvious purpose" is to "assure that the landlord is aware that the tenant considers a condition in the premises to constitute a breach of the warranty of habitability and intends to hold the landlord accountable in damages if the problem is not corrected in a reasonable time." In defendants' view, "a landlord may . . . be aware of a contaminant in the water supply but may nevertheless believe that the premises are perfectly habitable because the levels of contamination are low, or because the state officials are aware of the contaminant and have permitted continued occupancy and use of the water." The warranty of habitability does not, however, cover

minor defects that an ordinary person would grudgingly tolerate or those that a government entity in charge of public health would allow to persist without taking some action to protect the residents. Instead, it covers those defects that materially affect health and safety. 9 V.S.A. § 4458(a); *Hilder*, 144 Vt. at 160-61, 478 A.2d at 208-09. When, as here, the state's health department has established standards for safe levels of a contaminant in the residential water supply, has notified the landlord in writing that water in her building exceeds those levels, has imposed a "Do Not Drink" advisory for that water, and has relied on the landlord to notify the tenants and to make reasonable accommodations for a substitute water supply, the landlord has received all the notice the landlord is due. Additional notice from a tenant prior to a lawsuit by that tenant is of little value at that point, and we cannot agree that the Legislature intended to impose such a requirement in cases like this one.

¶ 26. We have observed, however, that the RRAA's overriding purpose was to codify the common-law relationship between landlords and tenants. *Vt. Tenants, Inc.*, 170 Vt. at 86, 742 A.2d at 751. Nonetheless, because we conclude that the statutory notice provision's manifest purpose is to ensure that landlords are not held liable for contract damages because of breaches of the warranty of habitability of which they were unaware, and thus had no opportunity to timely cure, we see no evidence of any legislative intent to preempt or change the common law on latent defects. Accordingly, we interpret the statute to achieve balance between tenant and landlord protections, leaving undisturbed consistent common-law rights that existed in habitability situations not clearly governed by the statute. See *Estate of Kelley v. Moguls, Inc.*, 160 Vt. 531, 533, 632 A.2d 360, 362 (1993) (permitting common-law negligence action where not expressly foreclosed by Dram Shop Act, and where legislative history supports view that Legislature did not intend to preempt it); *Klittner v. Steiner*, 158 Vt. 654, 655, 610 A.2d 149, 150 (1992) (mem.) (recognizing that where statute does not expressly foreclose a common-law cause of action, the common law lying outside the scope of a statute survives); cf. *Vt. Tenants, Inc.*, 170 Vt. at 84-85, 742 A.2d at 750 (recognizing that where Legislature could have explicitly drafted RRAA to deal with mortgagee taking title under strict foreclosure, but failed to do so, Court interprets Legislature's silence as indication that it did not intend to cover situation, particularly where application of statute would modify substantive common-law rights of mortgagee in many cases).

■ ¶ 27. In sum, at common law, the warranty of habitability covered all patent and latent defects. The statute cannot be applied to this case involving a latent defect because its enforcement provisions appear tailored only for cases based on patent defects. Specifically, the notice provision, which serves an obvious and important purpose of protecting landlord rights in patent habitability defect cases, has no discernible purpose in latent defect cases where landlords already have actual written notice of a habitability problem from someone other than a tenant. In light of this disparity, and of the fact that the RRAA contains no express language signifying that it was meant to apply to latent habitability defect cases, we conclude that the RRAA's enactment did not preempt common-law warranty of habitability actions involving latent defects of which a landlord already had actual knowledge. The common-law warranty of habitability against latent defects remained viable at the time that plaintiffs filed this case; thus, *Hilder v. St. Peter*, and not § 4458, controls.

¶ 28. We must also reject the trial court's conclusion that defendants fixed the problem within a reasonable amount of time. The court's error on this issue follows from its conclusion that notice from the tenants was required here. We have clarified that the relevant notice was that given by the state when it first notified Yvonne Rooney of the water's "Do Not Drink" status. Therefore, we think that the summary judgment record supports plaintiffs' contention that the partnership failed to remedy the habitability defect within a reasonable time after receiving the relevant notice.

■ ¶ 29. In all other respects, we conclude that, for summary judgment purposes, plaintiffs have alleged and sufficiently supported a claim for a common-law breach of the warranty of habitability. A landlord's failure to comply with applicable housing code regulations can result in a breach of the warranty of habitability. 9 V.S.A. § 4457; see also *Hilder*, 144 Vt. at 160, 478 A.2d at 208-09 (declaring that violation of housing code provision related to tenant health and safety may be prima facie evidence of breach of the warranty of habitability). The state and federal governments established standards regulating the amount of PCE that drinking water may contain before it becomes unsafe for human consumption. Here, the Department of Health repeatedly issued "Do Not Drink" advisories over a fourteen-year period because the water that the partnership was providing to its tenants regularly failed to meet those standards. Accordingly, as the trial court stated, "[i]t is obvious in this case that failure to provide

potable water to a housing project would be a breach of the implied warranty of habitability."

¶ 30. Finally, we are unpersuaded by the trial court's view, shared by the dissent, that the tort remedies potentially available to the tenants for any personal injuries suffered before they learned that the water was contaminated are a sufficient substitute for their common-law warranty-of-habitability action. The warranty of habitability is an implied part of every residential lease contract, 9 V.S.A. § 4457; *Hilder*, 144 Vt. at 159-61, 478 A.2d at 208-09, and actions for its breach sound in contract, *id.* As with any breach-of-contract action, a tenant prevails by showing he received less than he bargained for because of a defendant's breach. In residential lease contracts, a plaintiff's damages are calculated by determining the difference in value between the agreed-upon rent for his unit in habitable condition, and the value of the same unit with habitability defects. *Favreau*, 156 Vt. at 229, 591 A.2d at 73.

¶ 31. In *Favreau*, we distinguished this recovery from a recovery for personal injuries under a negligence theory, recognizing that the law of negligence involves more difficult questions of causation and comes into play only when, as here, a plaintiff has sustained a personal injury. *Id.* at 230, 591 A.2d at 73. These causation issues can be especially difficult when, as in this case, the alleged source of the injury is an invisible toxin whose effects may take years to manifest. *Favreau* makes clear that a tenant may bring both a contract action for the breach of the warranty of habitability and a negligence action arising from personal injuries allegedly suffered as a result of unsafe conditions on the premises; the two actions provide different remedies for different wrongs. *Id.* We cannot agree, therefore, that the Legislature intended to deprive tenants like the Willards and the Poulins of their contract remedy solely because their landlord had succeeded for so long in concealing its own contractual breach. But this is the effect of the trial court's holding.

¶ 32. Similarly, the fact that plaintiffs might also have remedies under the general consumer fraud statute for defendants' prenotice conduct does not justify interpreting and applying the RRAA in a way that denies plaintiffs a remedy for what even the trial court recognized would be, if proven, defendants' clear breach of a landlord's warranty obligations. In *Bisson v. Ward*, we held that actions under the Consumer Fraud Act and the RRAA are "separate and distinct claims." 160 Vt. 343, 350, 628 A.2d 1256, 1261 (1993). There, we allowed a plain-

tiff tenant to pursue both a consumer fraud action and a warranty-of-habitability action against her landlords. *Id.*[3]

## II. Partnership Liability

¶ 33. Plaintiffs also assign error to the trial court's conclusion that the individual Rooney defendants could not be held liable for any breach of the partnership's obligations because the Rooneys were not the tenants' landlords. Plaintiffs do not dispute that Parsons Hill Partnership was their landlord, and that the Rooneys were not. Nonetheless, they contend that the laws of limited partnership in effect at the time they filed suit allow for them to sue the general partner and any limited partners who have participated unduly in the control of the partnership. Without citation to authority, defendants argue that plaintiffs were required to assert their cause of action under partnership law. The trial court granted summary judgment for the Rooneys after concluding that they could not be held liable for the partnership's breach because they were, "[a]t best," agents of the landlord.

¶ 34. Our review of Vermont's limited-partnership law reveals no obstacle to plaintiffs' suit against the individual Rooney defendants. Moreover, the court erred in attempting, on summary judgment, to resolve disputed issues of fact surrounding the Rooneys' respective roles in the partnership. Thus, we reverse the trial court's grant of summary judgment in favor of the Rooney defendants.

---

[3] The dissent accuses the majority of reaching the decision in this case based on obvious sympathy for the plaintiffs, see *post*, ¶ 43, implying that it is sympathy rather than an appropriate statutory interpretation that compels the decision. It then speculates that plaintiffs could receive a double recovery because, as a result of a settlement, plaintiffs omitted all negligence and consumer fraud claims against defendants, including failure to warn, from their last amended complaint. To be clear, these claims were dropped as part of a multi-party settlement between plaintiffs and a variety of defendants who are no longer part of this case; the Rooneys and the partnership were not parties to that settlement. Thus, as the dissent acknowledges, plaintiffs' claims against the Rooneys and the partnership were not themselves settled. Without the benefit of argument from defendants on this topic, who did not raise any issue of double recovery, the dissent surmises that plaintiffs settled these claims for value. It admits that there is no record evidence on this point because plaintiffs' settlement with the non-Rooney defendants is not disclosed, but it uses this argument to buttress its opinion that the plaintiffs are not worthy of the majority's alleged sympathies. This argument is irrelevant in this case. The majority opinion either stands or falls on its interpretation of the cause of action before this Court, and not on whether there were other causes of action that plaintiffs filed, but ultimately gave up as part of a settlement with other parties.

¶ 35. Defendant Parsons Hill Partnership was organized under Vermont law in 1982. At that time and all times afterwards, Yvonne Rooney was the sole designated general partner. Sometime thereafter, Catherine and William Rooney were admitted as limited partners. From the time of the partnership's organization until approximately two years after plaintiffs filed the present lawsuit, Vermont limited partnerships were governed primarily by Title 11, chapter 11, formerly 11 V.S.A. §§ 1391-1420. Effective January 1, 1999, the Legislature repealed this chapter and replaced it with Title 11, chapter 23. 1997, No. 149 (Adj. Sess.), § 5. We apply the relevant provisions of the former laws because they were in effect at the time that all the partnership activities in question took place.

## A. General Partner Liability

¶ 36. As general partner in Parsons Hill Partnership, Yvonne Rooney had, with some limitation, all the rights and powers and was subject to all the liability of a general partner in a partnership without limited partners. 11 V.S.A. § 1399. Under former 11 V.S.A. § 1207(2), a partner in a partnership without limited partners is jointly liable for all debts and obligations of the partnership. As we noted, actions for breach of the warranty of habitability are contract actions. Thus, in plaintiffs' instant contract action, Yvonne Rooney, as general partner in a limited partnership, may be held jointly liable for the partnership's contract liability. See *Concra Corp. v. Andrus*, 141 Vt. 169, 174-75, 446 A.2d 363, 365 (1982) (holding that a partner in a partnership without limited partners is jointly liable for all the partnership's contract liability). Furthermore, 11 V.S.A. § 1416, titled "Parties to actions," provides that "[a] contributor, *unless he is a general partner*, is not a proper party to proceedings by or against a partnership." (Emphasis added.) Thus, the statute permits a plaintiff to include a general partner as a proper party to proceedings against the partnership.

## B. Limited Partner Liability

¶ 37. Plaintiffs claim that limited partners Catherine and William Rooney can also be held liable as general partners because they forfeited the protections afforded to limited partners when they participated in the control of the limited partnership. Specifically, plaintiffs allege that William and Catherine Rooney participated in the key conduct at issue here by serving as operators of the partnership's water system, by failing to disclose information about that water system to the tenants, and by failing to correct the water problem within a

reasonable time. Limited partners enjoy protection from personal liability to third parties flowing from partnership business or conduct. 11 V.S.A. § 1397. A limited partner may lose this protection, however, by taking part in the control of partnership business in a manner that exceeds the rights and powers of a limited partner. *Id.* In such a case, a limited partner is treated as a general partner subject to suit in proceedings against the partnership. *Id.*; 11 V.S.A. § 1416.

¶ 38. Without making any findings or reference to the applicable law, the trial court concluded that William and Catherine Rooney were agents of the landlord not subject to suit. Conclusions of a trial court that are not supported by findings cannot stand. *Bisson*, 160 Vt. at 350, 628 A.2d at 1261. Moreover, courts are not empowered to find facts on a summary judgment motion. *Berlin Dev. Assocs. v. Dep't of Soc. Welfare*, 142 Vt. 107, 111, 453 A.2d 397, 399 (1982). Instead, the court's task is to examine the affidavits or other summary judgment evidence to determine whether a triable issue exists. *Id.*

¶ 39. Numerous summary judgment exhibits document the contact that William and Catherine Rooney, along with Yvonne Rooney, had with state water authorities and the engineer assisting with the water problem. These support the inference that William and Catherine Rooney participated in the alleged decisions, made on behalf of the partnership, to withhold information about the water from the tenants while not supplying an alternative source of safe water, thereby contributing to the ongoing breach of the partnership's habitability obligation. Affording tenants the benefit of all the reasonable doubts and inferences to which they are entitled as nonmoving parties on summary judgment review, we conclude that they have identified a triable question of fact regarding the extent to which William and Catherine Rooney participated in the control of partnership business. The issue is, therefore, remanded to the trial court.

### III. Express Indemnity

¶ 40. Defendants cross-appeal the dismissal of their cross-claims for express indemnity[4] from Taggart Brothers, Inc., the contractor who constructed the water supply system that was eventually identified as the source of the contaminated water. Defendants seek indemnification in the event that tenants prevail on their warranty-of-habitability

---

[4] Defendants also asserted implied indemnity claims against Taggart Brothers. The trial court dismissed these claims as well, and defendants do not pursue them on appeal.

claims. The express indemnity agreement between Taggart Brothers and the partnership provides:

### 4.18 INDEMNIFICATION

4.18.1 To the fullest extent permitted by law, the Contractor shall indemnify, and hold harmless the [partnership] and the Architect and their agents and employees from and against all claims, demands, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from the performance of the Work, provided that any such claim, damage, loss or expense (1) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, and (2) *is caused in whole or in part by any negligent act or omission of the Contractor*, any Subcontractor, or anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, regardless of whether or not it is caused in part by a party indemnified hereunder.

(Emphasis added.) According to the agreement's terms, Taggart Brothers, as indemnitor, must pay defendants-indemnitees only for those claims, demands, losses, and expenses "caused in whole or in part" by Taggart Brothers' negligent act or omission. The trial court concluded that plaintiffs' common-law warranty of habitability claims fall outside of this provision's coverage. We agree.

¶ 41. Defendants cannot use the express indemnification agreement to seek reimbursement for habitability damages that plaintiffs may collect because the injury that will be redressed by plaintiffs' claims was not "caused in whole or in part by any negligent act or omission" on the part of Taggart Brothers. In this case, defendants' liability for breach of the common-law warranty of habitability will attach only if plaintiffs can prove that the partnership failed to remedy the water problem within a reasonable time after receiving notice of the contamination from the state. Whether Taggart Brothers' negligence caused the contamination in the first place is irrelevant to the warranty-of-habitability liability determination. A tenant is not automatically entitled to habitability damages the instant a defect arises; such damages are available only upon a landlord's knowing failure to timely remedy the defect.

¶ 42. Any money that the partnership must pay out to plaintiffs as a result of the claim before us will be attributable exclusively to its own failings. Taggart Brothers had no control over defendants' decision not to remedy the water contamination sooner than they did. As the trial court correctly stated, "only the landlords could breach the warranty of habitability."[5] Accordingly, we affirm.

*The grant of summary judgment in favor of Parsons Hill Partnership, Yvonne Rooney, William Rooney, and Catherine Rooney is reversed and remanded. The dismissal of the defendants' cross-claims for indemnification from Taggart Brothers, Inc. is affirmed.*

¶ 43. **Dooley, J.,** dissenting. Plaintiffs in this case seek redress for their landlord's failure to notify them of chemical contamination, that the landlord knew about, in the water serving their residences. Although plaintiffs alleged a number of claims arising from the landlord's inaction, they decided to pursue only their warranty-of-habitability claim in the superior court. Obviously sympathetic to plaintiffs' situation, the majority holds that the Legislature did not intend the Vermont Residential Rental Agreements Act (RRAA), 9 V.S.A., chapter 137, to cover latent defects known to the landlord. Thus, under the majority's holding, a tenant may sue for breach of the common-law warranty without prior notice to the landlord if the defect is latent, but the tenant must follow the statutory prerequisites to suit for all patent defects. I cannot join in the Court's decision because the statutory warranty of habitability supplants the common-law warranty and does not distinguish between latent and patent defects, and defendants' alleged conduct is fully actionable under a common-law tort. Accordingly, I respectfully dissent.

¶ 44. What distinguishes this case from any precedent on the inter-relationship of a statutory remedy and its common-law antecedent is

---

[5] Though the trial court reached the correct conclusion, its rationale contained a minor error. The court concluded that plaintiffs' claim did not implicate Taggart Brothers' negligence because defendants' liability, if any, will flow from their failure to notify the tenants of the contamination problem. While defendants' alleged failure to disclose the contamination problem to the tenants is troubling, standing alone, it cannot form the basis of warranty-of-habitability liability. Instead, liability is based on defendants' failure to timely remedy the problem. Nonetheless, we affirm because the trial court's rationale captures the essential point: any liability on this claim will result entirely from defendants' intentional failure to take action required by law. See *In re Audet*, 2004 VT 30, ¶ 10, 176 Vt. 617, 850 A.2d 1000 (mem.) (noting that Court may affirm correct result even when reached by improper rationale).

that the statute applicable in this case entirely and explicitly covers the situation that is before the court. The RRAA sets out a warranty of habitability requiring that the landlord provide "premises that are safe, clean and fit for human habitation and which comply with the requirements of applicable building, housing and health regulations." 9 V.S.A. § 4457(a). The language of § 4457(a) reflects the parameters of the common-law warranty that this Court adopted in *Hilder v. St. Peter*, 144 Vt. 150, 159, 478 A.2d 202, 208 (1984) (holding that landlord warrants to deliver over and maintain rental premises that are safe and fit for human living); see also *Vt. Tenants, Inc. v. Vt. Hous. Fin. Agency*, 170 Vt. 77, 86, 742 A.2d 745, 751 (1999) ("Although RRAA has tenant-protection and landlord-protection provisions, its primary purpose appears to be to codify the common law relationship for residential rental agreements."); *State v. Bisson*, 161 Vt. 8, 12, 632 A.2d 34, 37 (1993) (RRAA "contains the general law of landlord and tenant relations that is customarily applicable in any context"). *Hilder* made no distinction between latent and patent defects, 144 Vt. at 160, 478 A.2d at 208 ("[T]he implied warranty of habitability covers all latent and patent defects in the essential facilities of the residential unit."), and neither does the statute. By its plain meaning, the statute covers both. Just as explicitly, it requires the tenant to give "actual notice of the noncompliance," 9 V.S.A. § 4458(a), which the statute defines as "written notice hand-delivered or mailed to the last known address." *Id.* § 4451(1). Again, by its plain meaning, the statutory warranty covers the situation before this Court.

¶ 45. Our precedents are clear that where the statutory scheme covers the exact situation before the court, it preempts the common law. *Swett v. Haig's, Inc.*, 164 Vt. 1, 5, 663 A.2d 930, 932 (1995); *Winney v. Ransom & Hastings, Inc.*, 149 Vt. 213, 217-18, 542 A.2d 269, 271-72 (1988); see also *Klittner v. Steiner*, 158 Vt. 654, 655, 610 A.2d 149, 150 (1992) (mem.) (holding that when a claim falls squarely within the statute's language, the common-law claim does not survive). The situation here is quite close to *Swett*, where we followed the plain meaning of the statute to preempt the law with respect to contribution between joint tortfeasors over a dissent that the holding was inconsistent with legislative intent and would gut the statute's protection. 164 Vt. at 5, 12-13, 663 A.2d at 932, 936-37. In doing so, we noted that the legislative history was "sparse and ambiguous." *Id.* at 6, 663 A.2d at 932. The majority opinion pays lip service to our case law on statutory preemption of common-law claims, but does not reconcile its action with that precedent.

¶ 46. Notwithstanding the Legislature's adoption of the common-law warranty of habitability in toto, the majority carves out a narrow and unspoken exception for latent defects because it believes the Legislature overlooked the issue. See *ante*, ¶ 23 ("This oversight is understandable . . . ."). It draws that conclusion from committee discussion on patent, but not latent, defects. See *ante*, ¶ 22. Ultimately, the majority concludes that requiring notice for latent defects "serves no similarly important or logical purpose." *Id.* ¶ 20. In my view, the majority's rationale involves imperfections that often inhere in legislation. The Legislature rarely predicts every eventuality and covers it in the resulting legislation. See *Colwell v. Allstate Ins. Co.*, 2003 VT 5, ¶¶ 10-15, 175 Vt. 61, 819 A.2d 727 (construing a statute according to its express terms even though legislative history suggested that the Legislature overlooked the statute's application in one particular context). In responding to concerns of landlords, the drafting committee may well have gone further than necessary to protect their legitimate interest. These imperfections are not grounds for refusing to apply a clear legislative requirement, however much we may disagree with it. In my view, the Legislature's inattention to the question of latent defects, and the RRAA's consequent imperfection as it relates to those defects, cannot justify the majority's interpretation of the statutory scheme.

¶ 47. There is a much more obvious reason why the Legislature would construct a warranty-of-habitability scheme without distinguishing between latent and patent defects, and that reason involves an appropriate interaction between the statute and the common law. In this case, plaintiffs seek damages for the anguish they have suffered since discovering that, without any prior warning, they exposed themselves and their children to a dangerous chemical whose future health effects are unknown. Plaintiffs did not need either a common-law or statutory warranty of habitability to bring this claim. Defendants' failure to disclose the water contamination is actionable under a long-recognized exception to the caveat lessee doctrine. Thus, plaintiffs' inability to recover is created not by the notice provisions of the RRAA, but instead by their choice of liability theory.

¶ 48. Before the adoption of the implied warranty of habitability in residential rental agreements, the common law recognized the harshness of the caveat lessee doctrine with respect to latent defects known to the landlord. R. Schoshinski, American Law of Landlord and Tenant § 3:12 (1980). An exception to the doctrine emerged that made a landlord liable for latent defects that the landlord knew about at the time of

the tenant's entry, but failed to disclose to the tenant. *Id.*; 1 H. Tiffany, The Law of Landlord and Tenant § 86, at 562 (1910); 1 J. Taylor, The American Law of Landlord and Tenant § 382, at 482 (9th ed. 1904). The landlord's liability arose from his silence about the latent defect because the landlord owed no duty to repair the premise under the common law. *Maywood v. Logan*, 43 N.W. 1052, 1053 (Mich. 1889); *Steefel v. Rothschild*, 72 N.E. 112, 114 (N.Y. 1904); *Tucker v. Hayford*, 75 P.3d 980, 984 (Wash. Ct. App. 2003); see also Schoshinski, *supra*, § 3:12, at 111 (discussing various remedies for landlord's nondisclosure of dangerous and known latent defect the tenant is not likely to discover). For example, a landlord's failure to disclose water contamination to his tenants stated a common-law cause of action under this theory in a Washington case. *Tucker*, 75 P.3d at 984. In that case, the landlord was aware of the water contamination and the need to test the water system periodically. The tenants were unaware of the contamination, and they later became ill from it after consuming the water. The *Tucker* court explained that, although the common law did not require the landlord to discover or repair obscure defects existing when the tenant takes possession, the landlord is liable for not disclosing "'known dangers which are not likely to be discovered by the tenant.'" *Id.* (quoting *Aspon v. Loomis*, 816 P.2d 751, 756 (Wash. Ct. App. 1991)). The court sent the case back for trial on the common-law failure-to-disclose claim, as well as other claims, including a breach of the implied warranty of habitability.

¶ 49. The result in this case is that plaintiffs are, in effect, getting double liability from the same theory. Plaintiffs were fully aware that negligent failure to disclose a latent defect known to the landlord was actionable, and in each of the three complaints they filed, they pled this cause of action. By the third amended complaint, they had reached the point, however, that the proliferation of defendants and causes of actions, leading in turn to cross-claims and third-party claims, was seriously slowing the progress of the case. As a result, they settled with all defendants except Parsons Hill Partnership and the Rooney family defendants. Part of the terms of the settlement required them to amend the complaint to delete claims of negligent failure to disclose against the remaining defendants and to go forward with only claims based on "active fault" in the breach of the implied covenant of habitability. The transcripts of the hearings and the relevant documents show that this decision was made because the settling defendants wanted to eliminate the risk that the remaining defendants could transfer liability to them on a theory of indemnity or contribution.

Indeed, because the final version of the complaint raised only a claim of breach of warranty of habitability and required proof of "active fault," proof that would not otherwise be required on a theory of breach of warranty of habitability, the trial judge granted summary judgment to all the settling defendants on the claims of the remaining defendants for indemnity.

¶ 50. While the terms of the settlement are not disclosed, plaintiffs received value for dropping their tort claim that remaining defendants negligently failed to disclose a latent defect known to them. Now they want to assert the same theory under the rubric of implied warranty of habitability. No unfairness is caused by denying plaintiffs this additional liability route. They could have gone to trial against defendants under the common-law theory with no elements to prove beyond those in their current complaint.

¶ 51. The majority's illogical approach is most apparent from its conclusion about the 2000 amendment to 9 V.S.A. § 4458(a), which allows notice to come from "a governmental entity or a qualified independent inspector." 1999, No. 115 (Adj. Sess.), § 6. The majority concludes that: "[w]ith this amendment, the Legislature has now brought cases like plaintiffs' within the ambit of the statute, thus supporting our view that the former § 4458(a) did not cover the entire range of habitability claims." *Ante,* ¶ 24. Our law is that an amendment is intended to change the meaning of a statute unless a clarification of preexisting law is clearly indicated. See *State v. Thompson,* 174 Vt. 172, 178, 807 A.2d 454, 460 (2002); *Tarrant v. Dep't of Taxes,* 169 Vt. 189, 198, 733 A.2d 733, 740 (1999); *Jones v. Dep't of Employment Sec.,* 140 Vt. 552, 555, 442 A.2d 463, 464 (1982). In this case, the amendment adding a new class of persons who can provide notice is not clearly indicated as a clarification, and thus, it is intended to change the law. According to the majority's theory, however, this change was unnecessary because the original law didn't require notice for latent defects. The amendment is inconsistent with the majority's holding that the RRAA does not apply to latent defects.

¶ 52. I have further concerns about the majority's treatment of the amendment. Despite the fact that the amendment is intended to respond to the injustice the majority seeks to prevent, the Legislature did not choose to make a general distinction between latent and patent defects. Thus, the Legislature rejected the majority approach, and the majority is implementing it anyway. The Legislature will be surprised to find that despite its carefully constructed solution to the notice

problem, notice will be irrelevant for the tenants the Legislature sought to protect.

¶ 53. In summary, we are distorting our law on the relationship between statutory and common-law rights by enforcing a right directly denied by the plain meaning of the statute, all to give plaintiffs a theory of liability alternative to the theory they tactically chose to bargain away. In doing so, we are undermining a statutory amendment the Legislature enacted to respond to this kind of case. I respectfully dissent.

¶ 54. **Reiss, D.J.**, dissenting. I join in Justice Dooley's dissent insofar as it addresses 9 V.S.A. §§ 4457-4458 and the amendments thereto.