STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| | } | |
| In re: Zurn Sisters Development, LLC - | } | Docket No. 233-9-06 Vtec |
| Act 250 Jurisdictional Opinion | } | |
| No. DEC6-2006-1 (Reconsideration) | } | |
| | } | |

Decision and Order on Merits, Submitted by Cross-Motions for Summary Judgment

Appellant Zurn Sisters Development, LLC, appealed from a Jurisdictional Opinion of the District 6 Environmental Coordinator that its subdivision project requires an Act 250 permit. Appellant is represented by Thomas G. Walsh, Esq.; Intervenors Robert and Mary Ellen Jolley are represented by Howard J. Seaver, Esq.; the City of St. Albans is represented by Robert E. Farrar, Esq. Owners of one of the lots in the subdivision, Karl and Jane Zurn, entered their appearances and represent themselves. A neighbor to the west of the property, Paula Gamache Carlson, also entered her appearance representing herself. The Natural Resources Board did not enter an appearance in this appeal.

Appellant and Intervenors Jolley each moved for summary judgment on whether Appellant's project requires an Act 250 permit as a subdivision of more than ten lots within a five-year period. On the record of the final pretrial conference held on October 1, 2007 (after the motions were briefed), the participating parties requested that the trial scheduled for October 12, 2007 be cancelled and that the entire merits of the appeal be submitted through the already-filed summary judgment[1] motions, including the Court's consideration

---

[1] The Vermont Supreme Court has noted that the trial courts "should be cautious in granting motions for summary judgment in any cases in which the resolution of the dispositive issue requires determination of state of mind, as the fact finder normally should be given the opportunity to make a determination of the credibility of witnesses, and the demeanor of the witness whose state of mind is at issue." Barbagallo v. Gregory, 150 Vt.

1

of the complete deposition testimony of various witnesses. The trial was cancelled and the parties were given an opportunity to supplement their memoranda. The following facts are undisputed unless otherwise noted.

On November 21, 2003, Karl and Jane Zurn acquired an 18.36-acre parcel of land on the northerly side of Congress Street, across Congress Street from the end of Smith Street. Approximately eleven acres of the property is located in the City of St. Albans and approximately seven acres in the Town of St. Albans. The property bears the address of 121 Congress Street and is sometimes known as the "Governor Smith" property. The property slopes down from its northeasterly corner in the Town portion of the property, towards the southwest, losing approximately eighty feet of elevation within the City portion of the property alone.

Karl and Jane Zurn first envisioned building a residence for themselves on the property, and subdividing at least the remainder of the land in the City. However, after Karl and Jane Zurn purchased other property for their residence in Fairfield in early 2004, they began to consider different ideas for the development of the subject property. At least three potential development layouts were prepared by David Burke of O'Leary-Burke Civil Associates (the project engineer), in January, March and April of 2004.[2] These plans show ten or twelve lots on the property in the City; one shows a larger lot to accommodate three four-unit buildings. All three of these plans show access into the property from Congress Street by a T-shaped roadway, with a north-south segment leading from Congress Street

653, 653 (1988) (mem.) (citations omitted). However, in the present case the parties agreed to present the case on summary judgment, including the complete depositions of the witnesses who would have testified at trial, even though the issue turns on the "intent" of the developer.

[2] These dates are based on the drawing date and, if legible, the marginal print dates on the three plans from early 2004 provided as Jolley Exhibit F-7.

into the property, directly across Congress Street from the existing intersection with Smith Street, to create a standard four-way intersection. All three of the plans show the subdivision roadway as having two east-west segments, one extending easterly from the T intersection and one extending westerly from the T intersection, each with a cul-de-sac or turnaround at its end.

In March of 2004, Karl Zurn wrote a short handwritten note to the City's Zoning Administrator stating that he was "looking to do a 10-lot subdivision" with nine of the lots proposed for single family homes and the tenth lot proposed for three "fourplex townhouses." The Zoning Administrator replied, also in handwriting, that such a plan would "require 9 lots of 9,500 [square feet] each and one lot of 3 acres for a Planned Residential Development [PRD] for the 12 townhouses."

The City of St. Albans Development Review Board (DRB) considered this proposal at its April 5, 2004 public hearing, characterizing the proposal as a "sketch plan," that is, the most preliminary stage of subdivision approval. See In re Appeal of Carroll, 2007 VT 19, ¶¶ 13–14 (describing the stages of the subdivision approval process). Mr. Zurn stated at the April 2004 hearing that "he knows he will have to go through Act 250" for this proposal. The DRB issued a written letter on April 14, 2004, stating that the proposed subdivision was classified as 'major,' that the project would require Act 250 approval, and listing the extensive additional information that the DRB would require for the next hearing or any further steps in the subdivision process, and requesting that the project engineer attend future DRB hearings. As explained by the Zoning Administrator during that hearing, the project as shown in the April 2004 sketch plan would have needed conditional use approval for the PRD, as well as preliminary and final subdivision approval for the subdivision. No plans for this larger project were ever submitted to the DRB beyond this initial conceptual or sketch plan.

However, in the summer of 2004, attorney James Levy approached Mr. Zurn about

the possibility of Mr. Zurn's selling all or part of the Governor Smith property so that the property might be preserved as undeveloped. He volunteered to act as a facilitator to try to find a municipal or non-profit buyer, and asked Mr. Zurn what would be the smallest subdivision he would be willing to consider in connection with the conveyance of the remainder of the property to such a buyer. Mr. Zurn informed Mr. Levy that he would be willing to consider such a plan if it included six house lots. These discussions continued throughout the summer and early autumn of 2004 and included representatives of the City, and representatives of a local land trust that administers the adjacent Aldis Hill Playground land in the Town.

As of September 15, 2004, the engineering firm had drawn up a new sketch plan, showing an initial layout for the subdivision, including a single north-south subdivision roadway culminating in a cul-de-sac, six house lots and a lot for a stormwater retention pond (all located to the east or north of the subdivision roadway), and showing the remaining land within the City and Town as an undivided 13.3 acres of "retained land." In this plan, the subdivision roadway ends in a cul-de-sac, without any east-west segments.

The City DRB held a public hearing on September 20, 2004, regarding a proposal from Mr. Zurn that the DRB again characterized as a "sketch plan," this time for a "proposed seven (7) lot sub division (6 single family homes and one undeveloped lot)." On September 21, 2004, Mr. Zurn sent a short typewritten letter to the DRB, confirming that "[t]his letter is to inform you of our intent to develop the Governor Smith property. At this time we are proposing to develop 6 lots as single-family dwellings and to sell the remaining property to non-profit entities."

The DRB issued a written letter on October 15, 2004, again simply describing the project in a section entitled "Findings of Fact" and requesting additional listed information "[i]n order for the Development Review Board to make completely informed decisions in the future steps of the subdivision process."

4

The last meeting organized by Mr. Levy to discuss the potential sale of the remaining property to the City or to a private non-profit entity was held on October 29, 2004. Mr. Levy's last contact with Mr. Zurn was at that meeting. The Aldis Hill Trust expressed an interest at that meeting in acquiring the land in the Town. The City was unable to find funding for the purchase of the remaining land in the City; the City's Community Development Director informed Mr. Zurn of that fact by telephone in early 2005.

Karl and Jane Zurn continued to pursue the development of only the six house lots and the stormwater lot on the westerly portion of the property located in the City. The project engineer prepared a plan dated December 27, 2004, consisting of six sheets[3], showing eight lots: the six house lots and the stormwater pond lot (all lying to the west or north of the subdivision roadway), comprising approximately 4.09 acres, and an eighth lot consisting of the 13.3 acres of retained land, approximately half of which lies within the City and half in the Town.

In late December of 2004 and early January of 2005, as part of their estate plan, Karl and Jane Zurn deeded the entire 18-acre property to their three daughters, Jane Brooks Zurn, Bridget McMahon Zurn, and Mary Zurn Herrera, giving them each undivided equal interests in the property as tenants in common.

On May 13,[4] 2005, under title of "Zurn Parcel," the project engineer prepared a plan

---

[3] This plan is referred to in Mr. Burke's deposition and in the Island Excavating Corp. site work proposal, but has not been provided to the Court, nor is there any indication as to whether this plan or some similar plan was presented to the DRB for preliminary plat approval.

[4] The date of this plan is inferred from the first revision date on Appellant's Exhibit G; the second revision date shown on Exhibit G is the August 1, 2006 preparation of the "record" site plan apparently submitted with the application for the as-built approval considered in September of 2006. The Court has not been provided with the version of the

5

containing "General Revisions for Final Submittal" to the DRB. This plan contains details of the proposal subdivision street,[5] six development lots, and stormwater pond lot, but represents only a portion of the "Remaining Lands," which are still referred to as comprising 13.30 acres. The remainder of the site plan sheets prepared for this application, showing the details of any utility lines or connections as then proposed within the subdivision street right-of-way, has not been provided to the Court in connection with the present motions. On June 28, 2005, the City approved the project's connection to the municipal potable water supply and to the municipal sanitary sewer.

On July 20, 2005, Island Excavating Corp. submitted a proposal to Karl Zurn for the site work necessary for the completion of the project plans prepared by the civil engineering firm. The proposal refers to the plans as Sheets 1 through 6 of the plans and specifications dated December 27, 2004.

An application was submitted to the State Agency of Natural Resources on July 26, 2005, for state approval of the potable water supply and wastewater disposal to serve the six lots. If a separate site plan was prepared for this application, or if one of the existing site plans was submitted with this application, showing the details of those connections as then proposed within the subdivision street right-of-way, such a plan has not been provided to the Court in connection with the present motions. The parties do not dispute that the water line to serve the project ran under the sidewalk along the west side of the project street's right-of-way, and that the sewer line to serve the project ran under the centerline of the project street's right-of-way.

---

plan that received final subdivision approval from the City DRB, or the date of that approval.

[5] The parties do not dispute that the subdivision roadway was proposed to become a City street.

6

A project review sheet was issued in August of 2005, showing no Act 250 jurisdiction as of that time. It has not been provided to the Court in connection with the present motions.

The State Agency of Natural Resources approved the water supply and wastewater disposal permit for the project in October of 2005. It has not been provided to the Court in connection with the present motions.

The final subdivision plan must have been approved by the City DRB at some time prior to December 6, 2005, as a plan marked "final" was received for filing in the City's land records on December 6, 2005. The photocopy of the portion of this plan provided to the Court as Jolley Exhibit F-4 is not complete in that it does not show all of the signature block or its revision dates, or whether the DRB stamped it as approved for filing. That plan shows the lot layout of the six house lots, the stormwater pond lot, the street and the "remaining lands" lot. It also shows a 20-foot-wide "access easement" leading from the east side of the subdivision street across the portion of the "remaining lands" in the City, giving access to the "Aldis Hill Playground" lands in the Town, "to be centered on future access." The note on the plan also states "[s]hould the retained lands be developed at a future date, this easement will be relinquished and a new access easement shall be provided."

By a deed recorded on January 4, 2006 (signed on December 15 and December 19, 2005), the three Zurn sisters conveyed their interests in the property to Appellant Zurn Sisters Development, LLC ("ZSD"). Bridget McMahon Zurn signed the property transfer tax return on behalf of ZSD. The three sisters are the only managers, principals, or officers of ZSD. Also on December 15, 2005, they as individuals conveyed an easement to Central Vermont Public Service Corporation and Verizon of New England as tenants in common for the purpose of installing electricity and communications lines over the property from Congress Street "to serve present and future development of Grantors." In February of

7

2006, ZSD granted Vermont Gas Systems, Inc. an easement as necessary to provide gas service to "each and every building to be built" in the development in which it has customers. Three gas valves shown on the August 1, 2006 record drawing show that a gas line was installed on the property; it was installed within the east side of the right-of-way, to obtain the required isolation distance from the other utilities. Therefore, the gas service lines were installed from the east side line across the subdivision street to the west side to serve any of the six approved lots to the west and north of the subdivision street and cul-de-sac.

The excavating and site work on the infrastructure for the project was done in the winter of 2005 into early 2006. Subsurface drains were installed along the east side of the street, tied into a line running under the road to the stormwater retention pond, to keep stormwater runoff from the higher-elevation easterly undeveloped portion of the property from running onto the surface of the subdivision street. The October 18, 2006 decision of the City DRB approving this work reflects a finding that the "lateral water running on the east side of the access road caused the need to install street footing drains to be added and directed to the retention water pond to catch water runoff from higher elevations;" that is, that the footing drains serve the subdivision street rather than serving potential additional lots on the east side of the street.

At some point while the water and sewer lines were being installed, the site work and excavation contractor suggested that, if there might be any possibility of developing the land on the east side of the street in the future, it would be a cost savings during the initial site work to extend stubs or connections for sewer and water service across to the east side of the street, so that the municipal street would not have to be dug up again. It would cost as much as ten times more to dig up the street and the lines for that purpose after the street and sidewalk were constructed and paved, than it would to extend those lines to the east edge of the right-of-way during the initial site work on the street. The idea

8

of installing stubs on the east side of the right-of-way was made by the contractor to the project engineer and project manager, who discussed it with Bridget Zurn and obtained her approval of the change order for the additional site work.

Any future lots to be served by a future east-west subdivision roadway in the vicinity of the access easement to the Aldis Hill lands would be served by water and sewer lines extending along that new subdivision roadway and would not require individual water or sewer connections along the east side of the existing subdivision street. Accordingly, on December 29, 2005 the project engineer drafted a concept plan for a second phase of development, which was used only by him to determine the appropriate locations for, and numbers and sizes of, sewer and water stubs, and to show these to the contractor. This plan was not submitted to the City or the State for any purpose, was not recorded anywhere, and was not attached to any application. The late December 2005 concept plan was similar to the ones originally drafted in 2004, and showed three or four[6] potential lots that might require sewer and water service from the east side of the existing north-south subdivision street, with the remaining five or six potential lots obtaining service from an east-west subdivision roadway extending easterly from the existing cul-de-sac.

Bridget McMahon Zurn approved the contract change order on January 12, 2006, adding four sewer and four water stubs to the Island Excavating contract. Accordingly, four[7] water and five sewer stubs were installed along the east side of the existing north-south subdivision street, just beyond the street right-of-way. Of these, three of the water stubs and four of the sewer stubs were of an appropriate size to serve a single-family

---

[6] Lot 12 is placed on the late December concept plan in a position that could potentially obtain service from either location.

[7] The September 1, 2006 record drawing (Appellant's Exhibit G) depicts a total of four water stubs on the east side of the road, but states, next to the most southerly of the water stubs: "typical existing water stub with shut-off (5 total east side of road)."

house. The fifth sewer stub and the fourth water stub were installed near the intersection of the east-west easement with the existing north-south subdivision street, sized to allow the future extension of water and sewer service along that easement to serve additional lots. After installing the stubs underground, the contractor installed vertical plastic piping extending above the surface of the ground to mark the locations of the underground stubs, labeling these either by the individual lot numbers with reference to the late December 2005 concept plan, or by the phrase Phase II for the larger-sized ones located near the access easement.

Similarly, electric service was installed to electric pedestals and transformers on the west side of the subdivision street, but no individual electric stubs were installed on the east side of the subdivision street. Rather, a single electric service line crosses the subdivision street to pedestals at the east side of the neck of the cul-de-sac. A future transformer installation would be necessary to provide electric service from that location to any future individual house lots.

Two of the six development lots in the subdivision have been sold: Lot 1 to Karl and Jane Zurn on April 20, 2006, and Lot 5 to John and Susan Palmer (as trustees of their Joint Revocable Trust) on May 16, 2006.

Based on field location surveys conducted on July 28, 2006, and on various site visits and the project engineer on September 1, 2006 prepared the Record Drawing for the subdivision, showing the building envelopes for the six house lots, showing the stormwater retention pond, and showing the as-built street, sidewalk, and infrastructure installation, including water, sewer, and stormwater infrastructure, electric, telephone and television pedestals and electric transformer pads, and gas sleeves and valves.

The City DRB held a public hearing on September 18, 2006, to consider "amendments to a previously-approved site plan" to address the changes that had occurred during construction. Its decision, issued on October 18, 2006, approved the

10

various changes, and noted that public comment on the amendment had included questions "about circumventing Act 250 by spacing out the subdivision." It made findings that the utility stubs at issue in the present appeal were added so that ZSD "would not have to dig up the road if they wanted to expand"; the findings characterize the stubs as being added "for future expansion," "for future access," or for "phase two" of the project.

An Act 250 permit is required for the sale or offer for sale of any interest in "a subdivision." 10 V.S.A. § 6081(a). In a municipality which has duly adopted permanent zoning and subdivision bylaws,[8] the term "subdivision" is defined, in pertinent part, as "a tract or tracts of land, owned or controlled by a person, which the person has partitioned or divided for the purpose of resale into 10 or more lots [within a defined geographical area] within any continuous period of five years." 10 V.S.A. § 6001(19) (emphasis added). That is, unless at least ten lots have been created within a five-year period, the project falls outside this definition of the term "subdivision."

The definition also excludes lots created to be conveyed to a qualified holder of conservation rights and interest. If the land in the Town has been or will be conveyed to the Aldis Hill Trust, the partition of the land at the City-Town boundary will not be counted as the creation of a lot.

The Land Use Panel of the Natural Resources Board, as the successor to the Environmental Board, revised the former Environmental Board Rules effective as of May 1, 2006 (the Act 250 Rules). With respect to the provisions of Rule 2(B) regarding

_____

[8] Both the City of St. Albans and the Town of St. Albans have adopted such bylaws; this decision does not further consider the sections of the statute or rules applicable in municipalities without such bylaws.

11

subdivisions, the current Act 250 Rules contain essentially the same provisions[9] as former Environmental Board Rule 2(B), albeit organized more clearly.

Section 1 of Act 250 Rule 2(B) contains the provisions for determining how to count the statutory "continuous five-year period." The period begins with the <u>latest</u> of any of four listed events: the filing of a plot plan in the town records after the issuance of any required local or state approval; the issuance of a municipal subdivision or zoning permit; the issuance of a state subdivision permit or a state water supply and wastewater disposal permit; or, in the absence of any of the first three events, the legal conveyance of a lot.

For the purposes of commencing the count of the five-year period in the present appeal, the latest of the listed events appears to have occurred some time in 2006, either with the conveyance of the first lot to Karl and Jane Zurn in April of 2006, under subsection 2(B)(1)(d), or with the issuance of the as-built site plan approval by the City DRB on October 18, 2006, under subsection 2(B)(1)(b), or with a later filing of its revised site plan in the town records, if such a filing did occur. In the present appeal, no party suggests that the applicable five-year period expires any earlier than 2011.

Section 2 of Act 250 Rule 2(B) provides that a subdivision will be considered to have been created as of the occurrence of the <u>earliest</u> of any of four listed events, of which subsection (a) is the only one the parties or the Jurisdictional Opinion considered to be even potentially applicable[10] to the present case. It is triggered by the sale of (or the offer to sell

---

[9] The parties do not argue that there is any applicable difference between the former and current rules.

[10] The other subsections trigger Act 250 jurisdiction by the filing of a plot plan for an at-least-ten-lot subdivision in the town records (or in a complete application for a municipal subdivision or zoning permit, or for a state subdivision permit or a state water supply and wastewater disposal permit); or by the covers the sale or offer to sell or lease the tenth lot within the five year period.

12

or lease) the first lot in the subdivision, if and only if that sale or offer is combined "with an intention to sell, offer for sale, or lease: ten or more lots. . . ." Subsection (a) also provides that a "person's intention to create a subdivision may be inferred from the existence of a plot plan, the person's statements to financial agents or potential purchasers, or other similar evidence." Subsection (a) is the only one that requires an analysis of intent.

It is important to bear in mind that the "intention to create a subdivision" referenced in the second sentence of the rule necessarily incorporates the statutory definition of subdivision, requiring that the intention to create the ten or more lots be an intention to do so within the statutory period of five years. To interpret the rule otherwise would extend it beyond the jurisdictional limits of the statute. An administrative rule should not be interpreted in a way that is inconsistent with its enabling statute, or in a way that produces an unreasonable result. Lemieux v. Tri-State Lotto Comm'n, 164 Vt. 110, 116–17 (1995).

This Court must apply the substantive standards[11] of Act 250 that were applicable before the District Coordinator, 10 V.S.A. § 8504(h). By its terms, 10 V.S.A. § 6001(19) allows a landowner to create a nine-lot subdivision every five years (as the period is measured according to the rule) without triggering the need for an Act 250 permit. It is beyond the Court's role to alter the standards found in the legislation, which reflects the legislative policy that municipal and other state permits would be sufficient for projects that are smaller than this threshold number of lots-per-time-period.

Moreover, even if a developer were to have the present intention to develop successive nine-lot subdivisions every five years into the future, so as to avoid Act 250

---

[11] The Court must also give prior decisions of the former Environmental Board the same weight and consideration as it gives its own prior decisions. 10 V.S.A. § 8504(m). The Court has considered the two decisions to which the parties have directed the Court's attention, Donald I. Gurney, #2S0923-EB (Vt. Envtl. Bd. Nov. 2, 1993) and Black Willow Farm, DR #202 (Vt. Envtl. Bd. June 30, 1989), but has not given them great weight, as the fact patterns in those cases are not sufficiently similar to those in the present case.

13

jurisdiction, such an intention does not constitute an evasion of the statute because it is allowed by the statute. A contrary interpretation would render surplusage of the statutory five-year provision.

The recognized canons of statutory construction are applicable to this appeal. In re: Kim Wong Notices of Violation, Docket Nos. 169-7-06 Vtec and 293-12-06 Vtec, slip op. at 2 (Vt. Envtl. Ct., Mar. 12, 2007). The court must "construe words according to their plain and ordinary meaning, giving effect to the whole and every part of the ordinance," In re Stowe Club Highlands, 164 Vt. 272, 279–80 (1995) (citation omitted), so that no language is surplusage, In re Dunnett, 172 Vt. 196, 199 (2001), and so that the construction does not produce an absurd result. Willard v. Parsons Hill Partnership, 2005 VT 69, ¶21, 178 Vt. 300, 308 (2005).

As of the spring of 2006 when the first lot was sold, and, indeed, through the briefing of the present appeal, the evidence supports only a conclusion that ZSD's intent in placing the stubs prior to the completion and paving of the street was to keep its options open for the potential development of the remainder of the land at some undefined time in the future. The evidence, including the note on the plot plan recorded in December of 2005 that "[s]hould the retained lands be developed at a future date, this easement will be relinquished and a new access easement shall be provided," and including the circumstances of the placement, installation and labeling of the stubs, does not support a conclusion that ZSD had the intention further to develop those retained lands prior to the expiration[12] of the five-year period in 2011.

_____

[12] Appellant has itself noted that if it were to proceed, before the end of the five-year period, further to subdivide the retained land to create a total of ten or more lots, Act 250 jurisdiction will be triggered.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that Intervenor Jolleys' Motion for Summary Judgment is DENIED, and Appellant's Motion for Summary Judgment is GRANTED: that as of the sale of the first lot the development proposed for the parcel constituted only an eight-lot subdivision within the five-year period and therefore did not trigger Act 250 Jurisdiction. The September 1, 2006 Reconsidered Jurisdictional Opinion of the District Coordinator in No. DEC6-2006-1 (Reconsideration) is therefore reversed and vacated, concluding this appeal.

Done at Berlin, Vermont, this 9th day of November, 2007.

_____
Merideth Wright
Environmental Judge