### Ella Hilder v. Stuart St. Peter and Patricia St. Peter

[478 A.2d 202]

No. 82-440

Present: Billings, C.J., Hill, Underwood, Peck and Gibson, JJ.

Opinion Filed February 3, 1984

Motion for Reargument Denied May 4, 1984

---

154

*James M. Libby, Jr.*, Vermont Legal Aid, Inc., Montpelier, and *Sam Farrington*, Vermont Legal Aid, Inc., Rutland, for Plaintiff-Appellee.

*Robert E. Broderick*, Rutland, and *Diamond & Associates, P.C.*, Montpelier, for Defendants-Appellants.

**Billings, C.J.** Defendants appeal from a judgment rendered by the Rutland Superior Court. The court ordered defendants to pay plaintiff damages in the amount of $4,945.00, which represented "reimbursement of all rent paid and additional

compensatory damages" for the rental of a residential apartment over a fourteen-month period in defendants' Rutland apartment building. Defendants filed a motion for reconsideration on the issue of the amount of damages awarded to the plaintiff, and plaintiff filed a cross-motion for reconsideration of the court's denial of an award of punitive damages. The court denied both motions. On appeal, defendants raise three issues for our consideration: first, whether the court correctly calculated the amount of damages awarded the plaintiff; secondly, whether the court's award to plaintiff of the entire amount of rent paid to defendants was proper since the plaintiff remained in possession of the apartment for the entire fourteen-month period; and finally, whether the court's finding that defendant Stuart St. Peter acted on his own behalf and with the apparent authority of defendant Patricia St. Peter was error.

The facts are uncontested. In October, 1974, plaintiff began occupying an apartment at defendants' 10–12 Church Street apartment building in Rutland with her three children and new-born grandson.[1] Plaintiff orally agreed to pay defendant Stuart St. Peter $140 a month and a damage deposit of $50; plaintiff paid defendant the first month's rent and the damage deposit prior to moving in. Plaintiff has paid all rent due under her tenancy. Because the previous tenants had left behind garbage and items of personal belongings, defendant offered to refund plaintiff's damage deposit if she would clean the apartment herself prior to taking possession. Plaintiff did clean the apartment, but never received her deposit back because the defendant denied ever receiving it. Upon moving into the apartment, plaintiff discovered a broken kitchen window. Defendant promised to repair it, but after waiting a week and fearing that her two year old child might cut herself on the shards of glass, plaintiff repaired the window at her own expense. Although defendant promised to provide a front door key, he never did. For a period of time, whenever plaintiff left the apartment, a member of her family would remain behind for security reasons. Eventually, plaintiff purchased and in-

---

[1] Between October, 1974, and December, 1976, plaintiff rented apartment number 1 for $140.00 monthly for 18 months, and apartment number 50 for $125.00 monthly for 7 months.

stalled a padlock, again at her own expense. After moving in, plaintiff discovered that the bathroom toilet was clogged with paper and feces and would flush only by dumping pails of water into it. Although plaintiff repeatedly complained about the toilet, and defendant promised to have it repaired, the toilet remained clogged and mechanically inoperable throughout the period of plaintiff's tenancy. In addition, the bathroom light and wall outlet were inoperable. Again, the defendant agreed to repair the fixtures, but never did. In order to have light in the bathroom, plaintiff attached a fixture to the wall and connected it to an extension cord that was plugged into an adjoining room. Plaintiff also discovered that water leaked from the water pipes of the upstairs apartment down the ceilings and walls of both her kitchen and back bedroom. Again, defendant promised to fix the leakage, but never did. As a result of this leakage, a large section of plaster fell from the back bedroom ceiling onto her bed and her grandson's crib. Other sections of plaster remained dangling from the ceiling. This condition was brought to the attention of the defendant, but he never corrected it. Fearing that the remaining plaster might fall when the room was occupied, plaintiff moved her and her grandson's bedroom furniture into the living room and ceased using the back bedroom. During the summer months an odor of raw sewage permeated plaintiff's apartment. The odor was so strong that the plaintiff was ashamed to have company in her apartment. Responding to plaintiff's complaints, Rutland City workers unearthed a broken sewage pipe in the basement of defendants' building. Raw sewage littered the floor of the basement, but defendant failed to clean it up. Plaintiff also discovered that the electric service for her furnace was attached to her breaker box, although defendant had agreed, at the commencement of plaintiff's tenancy, to furnish heat.

In its conclusions of law, the court held that the state of disrepair of plaintiff's apartment, which was known to the defendants, substantially reduced the value of the leasehold from the agreed rental value, thus constituting a breach of the implied warranty of habitability. The court based its award of damages on the breach of this warranty and on breach of an express contract. Defendant argues that the court misapplied the law of Vermont relating to habitability because the plaintiff never abandoned the demised premises and, therefore, it

was error to award her the full amount of rent paid. Plaintiff counters that, while never expressly recognized by this Court, the trial court was correct in applying an implied warranty of habitability and that under this warranty, abandonment of the premises is not required. Plaintiff urges this Court to affirmatively adopt the implied warranty of habitability.

Historically, relations between landlords and tenants have been defined by the law of property. Under these traditional common law property concepts, a lease was viewed as a conveyance of real property. See Note, *Judicial Expansion of Tenants' Private Law Rights: Implied Warranties of Habitability and Safety in Residential Urban Leases,* 56 Cornell L. Q. 489, 489–90 (1971) (hereinafter cited as *Expansion of Tenants' Rights*). The relationship between landlord and tenant was controlled by the doctrine of caveat lessee; that is, the tenant took possession of the demised premises irrespective of their state of disrepair. Love, *Landlord's Liability for Defective Premises: Caveat Lessee, Negligence, or Strict Liability?,* 1975 Wis. L. Rev. 19, 27–28. The landlord's only covenant was to deliver possession to the tenant. The tenant's obligation to pay rent existed independently of the landlord's duty to deliver possession, so that as long as possession remained in the tenant, the tenant remained liable for payment of rent. The landlord was under no duty to render the premises habitable unless there was an express covenant to repair in the written lease. *Expansion of Tenants' Rights, supra,* at 490. The land, not the dwelling, was regarded as the essence of the conveyance.

An exception to the rule of caveat lessee was the doctrine of constructive eviction. *Lemle v. Breeden,* 51 Hawaii 426, 430, 462 P.2d 470, 473 (1969). Here, if the landlord wrongfully interfered with the tenant's enjoyment of the demised premises, or failed to render a duty to the tenant as expressly required under the terms of the lease, the tenant could abandon the premises and cease paying rent. *Legier v. Deveneau,* 98 Vt. 188, 190, 126 A. 392, 393 (1924).

Beginning in the 1960's, American courts began recognizing that this approach to landlord and tenant relations, which had originated during the Middle Ages, had become an anachronism in twentieth century, urban society. Today's tenant enters into

lease agreements, not to obtain arable land, but to obtain safe, sanitary and comfortable housing.

> [T]hey seek a well known package of goods and services— a package which includes not merely walls and ceilings, but also adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance.

*Javins* v. *First National Realty Corp.*, 428 F.2d 1071, 1074 (D.C. Cir.), *cert. denied,* 400 U.S. 925 (1970).

Not only has the subject matter of today's lease changed, but the characteristics of today's tenant have similarly evolved. The tenant of the Middle Ages was a farmer, capable of making whatever repairs were necessary to his primitive dwelling. *Green* v. *Superior Court,* 10 Cal. 3d 616, 622, 517 P.2d 1168, 1172, 111 Cal. Rptr. 704, 708 (1974). Additionally, "the common law courts assumed that an equal bargaining position existed between landlord and tenant . . . ." Note, *The Implied Warranty of Habitability: A Dream Deferred,* 48 UMKC L. Rev. 237, 238 (1980) (hereinafter cited as *A Dream Deferred*).

In sharp contrast, today's residential tenant, most commonly a city dweller, is not experienced in performing maintenance work on urban, complex living units. *Green* v. *Superior Court, supra,* 10 Cal. 3d at 624, 517 P.2d at 1173, 111 Cal. Rptr. at 707–08. The landlord is more familiar with the dwelling unit and mechanical equipment attached to that unit, and is more financially able to "discover and cure" any faults and breakdowns. *Id.* at 624, 517 P.2d at 1173, 111 Cal. Rptr. at 708. Confronted with a recognized shortage of safe, decent housing, see 24 V.S.A. § 4001(1), today's tenant is in an inferior bargaining position compared to that of the landlord. *Park West Management Corp.* v. *Mitchell,* 47 N.Y.2d 316, 324–25, 391 N.E.2d 1288, 1292, 418 N.Y.S.2d 310, 314, *cert. denied,* 444 U.S. 992 (1979). Tenants vying for this limited housing are "virtually powerless to compel the performance of essential services." *Id.* at 325, 391 N.E.2d at 1292, 418 N.Y.S.2d at 314.

In light of these changes in the relationship between tenants and landlords, it would be wrong for the law to continue to impose the doctrine of caveat lessee on residential leases.

> The modern view favors a new approach which recognizes that a lease is essentially a contract between the landlord

and the tenant wherein the landlord promises to deliver and maintain the demised premises in habitable condition and the tenant promises to pay rent for such habitable premises. These promises constitute interdependent and mutual considerations. Thus, the tenant's obligation to pay rent is predicated on the landlord's obligation to deliver and maintain the premises in habitable condition.

*Boston Housing Authority* v. *Hemingway,* 363 Mass. 184, 198, 293 N.E.2d 831, 842 (1973).

Recognition of residential leases as contracts embodying the mutual covenants of habitability and payment of rent does not represent an abrupt change in Vermont law. Our case law has previously recognized that contract remedies are available for breaches of lease agreements. *Clarendon Mobile Home Sales, Inc.* v. *Fitzgerald,* 135 Vt. 594, 596, 381 A.2d 1063, 1065 (1977) ; *Keene* v. *Willis,* 128 Vt. 187, 188, 191–92, 260 A.2d 371, 371–72, 374 (1969) ; *Breese* v. *McCann,* 52 Vt. 498, 501 (1879). More significantly, our legislature, in establishing local housing authorities, 24 V.S.A. § 4003, has officially recognized the need for assuring the existence of adequate housing.

[S]ubstandard and decadent areas exist in certain portions of the state of Vermont and . . . there is not . . . an adequate supply of decent, safe and sanitary housing for persons of low income and/or elderly persons of low income, available for rents which such persons can afford to pay . . . this situation tends to cause an increase and spread of communicable and chronic disease . . . [and] constitutes a menace to the health, safety, welfare and comfort of the inhabitants of the state and is detrimental to property values in the localities in which it exists . . . .

24 V.S.A. § 4001(4). In addition, this Court has assumed the existence of an implied warranty of habitability in residential leases. *Birkenhead* v. *Coombs,* 143 Vt. 167, 172, 465 A.2d 244, 246 (1983).

Therefore, we now hold expressly that in the rental of any residential dwelling unit an implied warranty exists in the lease, whether oral or written, that the landlord will deliver over and maintain, throughout the period of the tenancy, premises that are safe, clean and fit for human habitation. This

warranty of habitability is implied in tenancies for a specific period or at will. *Boston Housing Authority* v. *Hemingway, supra,* 363 Mass. at 199, 293 N.E.2d at 843. Additionally, the implied warranty of habitability covers all latent and patent defects in the essential facilities of the residential unit.[2] *Id.* Essential facilities are "facilities vital to the use of the premises for residential purposes . . . ." *Kline* v. *Burns,* 111 N.H. 87, 92, 276 A.2d 248, 252 (1971). This means that a tenant who enters into a lease agreement with knowledge of any defect in the essential facilities cannot be said to have assumed the risk, thereby losing the protection of the warranty. Nor can this implied warranty of habitability be waived by any written provision in the lease or by oral agreement.

In determining whether there has been a breach of the implied warranty of habitability, the courts may first look to any relevant local or municipal housing code; they may also make reference to the minimum housing code standards enunciated in 24 V.S.A. § 5003(c)(1)–5003(c)(5). A substantial violation of an applicable housing code shall constitute prima facie evidence that there has been a breach of the warranty of habitability. "[O]ne or two minor violations standing alone which do not affect" the health or safety of the tenant, shall be considered de minimus and not a breach of the warranty. *Javins* v. *First National Realty Corp., supra,* 428 F.2d at 1082 n.63; *Mease* v. *Fox,* 200 N.W.2d 791, 796 (Iowa 1972) ; *King* v. *Moorehead, supra,* 495 S.W.2d at 76. In addition, the landlord will not be liable for defects caused by the tenant. *Javins* v. *First National Realty Corp., supra,* 428 F.2d at 1082 n.62.

However, these codes and standards merely provide a starting point in determining whether there has been a breach. Not all towns and municipalities have housing codes; where there are codes, the particular problem complained of may not be addressed. *Park West Management Corp.* v. *Mitchell, supra,* 47 N.Y.2d at 328, 391 N.E.2d at 1294, 418 N.Y.S.2d at 316. In

---

[2] The warranty also covers those facilities located in the common areas of an apartment building or duplex that may affect the health or safety of a tenant, such as common stairways, or porches. *Javins* v. *First National Realty Corp., supra,* 428 F.2d at 1082 n.62; *King* v. *Moorehead,* 495 S.W.2d 65, 76 (Mo. Ct. App. 1973).

determining whether there has been a breach of the implied warranty of habitability, courts should inquire whether the claimed defect has an impact on the safety or health of the tenant. *Id.*

In order to bring a cause of action for breach of the implied warranty of habitability, the tenant must first show that he or she notified the landlord "of the deficiency or defect not known to the landlord and [allowed] a reasonable time for its correction." *King* v. *Moorehead, supra,* 495 S.W.2d at 76.

Because we hold that the lease of a residential dwelling creates a contractual relationship between the landlord and tenant, the standard contract remedies of rescission, reformation and damages are available to the tenant when suing for breach of the implied warranty of habitability. *Lemle* v. *Breeden, supra,* 51 Hawaii at 436, 462 P.2d at 475. The measure of damages shall be the difference between the value of the dwelling as warranted and the value of the dwelling as it exists in its defective condition. *Birkenhead* v. *Coombs, supra,* 143 Vt. at 172, 465 A.2d at 246. In determining the fair rental value of the dwelling as warranted, the court may look to the agreed upon rent as evidence on this issue. *Id.* "[I]n residential lease disputes involving a breach of the implied warranty of habitability, public policy militates against requiring expert testimony" concerning the value of the defect. *Id.* at 173, 465 A.2d at 247. The tenant will be liable only for "the reasonable rental value [if any] of the property in its imperfect condition during his period of occupancy." *Berzito* v. *Gambino,* 63 N.J. 460, 469, 308 A.2d 17, 22 (1973).

We also find persuasive the reasoning of some commentators that damages should be allowed for a tenant's discomfort and annoyance arising from the landlord's breach of the implied warranty of habitability. See Moskovitz, *The Implied Warranty of Habitability: A New Doctrine Raising New Issues,* 62 Calif. L. Rev. 1444, 1470–73 (1974) (hereinafter cited as *A New Doctrine*) ; *A Dream Deferred, supra,* at 250–51. Damages for annoyance and discomfort are reasonable in light of the fact that

> the residential tenant who has suffered a breach of the warranty . . . cannot bathe as frequently as he would

like or at all if there is inadequate hot water; he must worry about rodents harassing his children or spreading disease if the premises are infested; or he must avoid certain rooms or worry about catching a cold if there is inadequate weather protection or heat. Thus, discomfort and annoyance are the common injuries caused by each breach and hence the true nature of the general damages the tenant is claiming.

Moskovitz, *A New Doctrine, supra,* at 1470–71. Damages for discomfort and annoyance may be difficult to compute; however, "[t]he trier [of fact] is not to be deterred from this duty by the fact that the damages are not susceptible of reduction to an exact money standard." *Vermont Electric Supply Co.* v. *Andrus,* 132 Vt. 195, 200, 315 A.2d 456, 459 (1974).

 Another remedy available to the tenant when there has been a breach of the implied warranty of habitability is to withhold the payment of future rent.[3] *King* v. *Moorehead, supra,* 495 S.W.2d at 77. The burden and expense of bringing suit will then be on the landlord who can better afford to bring the action. In an action for ejectment for nonpayment of rent, 12 V.S.A. § 4773, "[t]he trier of fact, upon evaluating the seriousness of the breach and the ramification of the defect upon the health and safety of the tenant, will abate the rent at the landlord's expense in accordance with its findings." *A Dream Deferred, supra,* at 248. The tenant must show that: (1) the landlord had notice of the previously unknown defect and failed, within a reasonable time, to repair it; and (2) the defect, affecting habitability, existed during the time for which

---

[3] Because we hold that the tenant's obligation to pay rent is contingent on the landlord's duty to provide and maintain a habitable dwelling, it is no longer necessary for the tenant to first abandon the premises, *Northern Terminals, Inc.* v. *Smith Grocery & Variety, Inc.,* 138 Vt. 389, 396–97, 418 A.2d 22, 26–27 (1980); *Legier* v. *Deveneau, supra,* 98 Vt. at 190, 126 A. at 393; thus, the doctrine of constructive eviction is no longer a viable or needed defense in an action by the landlord for unpaid rent. *Lemle* v. *Breeden, supra,* 51 Hawaii at 435–36, 462 P.2d at 475; *Boston Housing Authority* v. *Hemingway, supra,* 363 Mass. at 199–200, 293 N.E.2d at 843; see also *Expansion of Tenants' Rights, supra,* at 491 (constructive eviction "[w]ith its absolute requirement of abandonment . . . is utterly unsatisfactory for a tenant faced with today's urban housing shortage").

rent was withheld. See *A Dream Deferred, supra,* at 248–50. Whether a portion, all or none of the rent will be awarded to the landlord will depend on the findings relative to the extent and duration of the breach.[4] *Javins* v. *First National Realty Corp., supra,* 428 F.2d at 1082–83. Of course, once the landlord corrects the defect, the tenant's obligation to pay rent becomes due again. *Id.* at 1083 n.64.

Additionally, we hold that when the landlord is notified of the defect but fails to repair it within a reasonable amount of time, and the tenant subsequently repairs the defect, the tenant may deduct the expense of the repair from future rent. 11 Williston on Contracts § 1404 (3d ed. W. Jaeger 1968) ; *Marini* v. *Ireland,* 56 N.J. 130, 146, 265 A.2d 526, 535 (1970).

In addition to general damages, we hold that punitive damages may be available to a tenant in the appropriate case. Although punitive damages are generally not recoverable in actions for breach of contract, there are cases in which the breach is of such a willful and wanton or fraudulent nature as to make appropriate the award of exemplary damages. *Clarendon Mobile Home Sales, Inc.* v. *Fitzgerald, supra,* 135 Vt. at 596, 381 A.2d at 1065. A willful and wanton or fraudulent breach may be shown "by conduct manifesting personal ill will, or carried out under circumstances of insult or oppression, or even by conduct manifesting . . . a reckless or wanton disregard of [one's] rights . . . ." *Sparrow* v. *Vermont Savings Bank,* 95 Vt. 29, 33, 112 A. 205, 207 (1921). When a landlord, after receiving notice of a defect, fails to repair the facility that is essential to the health and safety of his or her tenant, an award of punitive damages is proper. *111 East 88th*

---

[4] Some courts suggest that, during the period rent is withheld, the tenant should pay the rent, as it becomes due, into legal custody. See, e.g., *Javins* v. *First National Realty Corp., supra,* 428 F.2d at 1083 n.67; see also *King* v. *Moorehead, supra.* 495 S.W.2d at 77 (*King* requires the deposit of the rent into legal custody pending the litigation). Such a procedure assures the availability of that portion, if any, of the rent which the court determines is due to the landlord. *King* v. *Moorehead, supra,* 495 S.W.2d at 77; see *A Dream Deferred, supra,* at 248–50.

*Partners* v. *Simon,* 106 Misc. 2d 693, 434 N.Y.S.2d 886, 889 (N.Y. Civ. Ct. 1980).

> The purpose of punitive damages . . . is to punish conduct which is morally culpable . . . . Such an award serves to deter a wrongdoer . . . from repetitions of the same or similar actions. And it tends to encourage prosecution of a claim by a victim who might not otherwise incur the expense or inconvenience of private action . . . . The public benefit and a display of ethical indignation are among the ends of the policy to grant punitive damages.

*Davis* v. *Williams,* 92 Misc. 2d 1051, 402 N.Y.S.2d 92, 94 (N.Y. Civ. Ct. 1977).

 In the instant case, the trial court's award of damages, based in part on a breach of the implied warranty of habitability, was not a misapplication of the law relative to habitability. Because of our holding in this case, the doctrine of constructive eviction, wherein the tenant must abandon in order to escape liability for rent, is no longer viable. When, as in the instant case, the tenant seeks, not to escape rent liability, but to receive compensatory damages in the amount of rent already paid, abandonment is similarly unnecessary. *Northern Terminals, Inc.* v. *Smith Grocery & Variety, Inc., supra,* 138 Vt. at 396–97, 418 A.2d at 26–27. Under our holding, when a landlord breaches the implied warranty of habitability, the tenant may withhold future rent, and may also seek damages in the amount of rent previously paid.

 In its conclusions of law the trial court stated that the defendants' failure to make repairs was compensable by damages to the extent of reimbursement of all rent paid and additional compensatory damages. The court awarded plaintiff a total of $4,945.00; $3,445.00 represents the entire amount of rent plaintiff paid, plus the $50.00 deposit. This appears to leave $1500.00 as the "additional compensatory damages." However, although the court made findings which clearly demonstrate the appropriateness of an award of compensatory damages, there is no indication as to how the court reached a figure of $1500.00. It is "crucial that this Court and the parties be able to determine what was decided and how the decision

was reached." *Fox* v. *McLain*, 142 Vt. 11, 16, 451 A.2d 1122, 1124 (1982).

Additionally, the court denied an award to plaintiff of punitive damages on the ground that the evidence failed to support a finding of willful and wanton or fraudulent conduct. See *Clarendon Mobile Home Sales, Inc.* v. *Fitzgerald*, *supra*, 135 Vt. at 596, 381 A.2d at 1065. The facts in this case, which defendants do not contest, evince a pattern of intentional conduct on the part of defendants for which the term "slumlord" surely was coined. Defendants' conduct was culpable and demeaning to plaintiff and clearly expressive of a wanton disregard of plaintiff's rights. The trial court found that defendants were aware of defects in the essential facilities of plaintiff's apartment, promised plaintiff that repairs would be made, but never fulfilled those promises. The court also found that plaintiff continued, throughout her tenancy, to pay her rent, often in the face of verbal threats made by defendant Stuart St. Peter. These findings point to the "bad spirit and wrong intention" of the defendants, *Glidden* v. *Skinner*, 142 Vt. 644, 648, 458 A.2d 1142, 1144 (1983), and would support a finding of willful and wanton or fraudulent conduct, contrary to the conclusions of law and judgment of the trial judge. However, the plaintiff did not appeal the court's denial of punitive damages, and issues not appealed and briefed are waived. *R. Brown & Sons, Inc.* v. *International Harvester Corp.*, 142 Vt. 140, 142, 453 A.2d 83, 84 (1982).

We find that defendants' third claimed error, that the court erred in finding that both defendant Stuart St. Peter and defendant Patricia St. Peter were liable to plaintiff for the breach of the implied warranty of habitability, is meritless. Both defendants were named in the complaint as owners of the 10–12 Church Street apartment building. Plaintiff's complaint also alleged that defendant Stuart St. Peter acted as agent for defendant Patricia St. Peter. Defendants failed to deny these allegations; under V.R.C.P. 8(d) these averments stand as admitted.

*Affirmed in part; reversed in part and remanded for hearing on additional compensable damages, consistent with the views herein.*

Billings, C.J. On the motion for reargument, defendants claim that equitable relief was sought below and that pursuant to *Soucy* v. *Soucy Motors, Inc.,* 143 Vt. 615, 471 A.2d 224 (1983), the trial court had no jurisdiction since the cause was heard by the presiding judge and one assistant judge. An examination of the record reveals that plaintiff's equitable claims were directed against other defendants who were dismissed prior to trial; at trial only compensatory and punitive damages were sought against the defendants here. See *Vermont National Bank* v. *Dowrick,* 144 Vt. 504, 481 A.2d 396 (1984).

*Motion for reargument denied.*