NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 132

No. 2014-370

| | |
|---|---|
| Timothy Terry and Penny Terry | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Civil Division |
| | |
| William O'Brien and Susan Cain O'Brien | April Term, 2015 |

Dennis R. Pearson, J.

Theodore J. Studdert-Kennedy and Ronald A. Ferrara of Otis & Kennedy, LLC, Montpelier, for
  Plaintiffs-Appellees.

Nicole A. Killoran and John C. Gravel of Bauer Gravel Farnham, Colchester, for
  Defendants-Appellants.

Marina A. Asaro, Montpelier, for Amicus Curiae Vermont Legal Aid, Inc.


PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1.    **REIBER, C.J.**    Defendant landlords appeal a jury verdict and post-judgment order in this landlord-tenant action involving warranty-of-habitability and consumer-protection claims. We vacate the verdict and judgment, except for the jury's award of unpaid rent, and remand the matter for further proceedings consistent with this opinion.

I. Facts and Procedural History

¶ 2.    In the early 1980s, landlords William and Susan O'Brien purchased the subject property, which is located in the Old North End of Burlington and includes a two-story house and brick building (referred to as the creamery) with a common wall to the rear of the house.

The creamery has no fixtures and has never been inhabited. After landlords purchased the property in 1982, the house was occupied for one year by landlords, then for several years by families in a refugee resettlement program, and then by the family of William O'Brien's sister for thirteen years until late 2002.

¶ 3. In December 2002, following foreclosure proceedings on their home in South Hero, plaintiff tenants, Timothy and Penny Terry, along with their two children, accepted landlords' offer to occupy the Old North End house rent-free for the time being. William O'Brien, an attorney, had represented members of the Terry family in various legal proceedings, including the foreclosure proceedings, during the previous fifteen years or so. After their first year in the house, tenants began paying rent. There was no written rental agreement, but, from at least December 2005, six years before tenants filed the instant lawsuit, there was an oral agreement to pay monthly rent in an amount that varied over the years. Eventually, the parties' relationship deteriorated because of landlords' unhappiness over tenants' nonpayment or late payment of rent.

¶ 4. In March 2005, Burlington Code Enforcement (BCE) inspected the house and cited landlords for multiple problems that required repair. A follow-up inspection in January 2006 confirmed that most of the repairs had been completed. BCE inspected the property again later in 2006 and found additional items that required repair, most of which were completed soon thereafter. In 2008, BCE performed several more inspections and issued notices of violations, many of which concerned the creamery. In May 2008, Vermont Gas inspected the house's furnace and determined that it needed to be repaired or replaced because it was in extremely poor condition. In November 2008, landlords had a 40,000 btu space heater installed on the first floor of the house, but apparently it was insufficient to heat the second floor. As a result, tenants began using space heaters on the second floor at night.

¶ 5.    On December 15, 2008, a fire broke out in the attic of the house above one of the bedrooms.  The bedroom below the point of the fire's origin sustained heavy fire damage, while the other rooms in the house sustained fire, smoke, and/or water damage.  Tenants were not in the house when the fire occurred and thus were not injured, but they had to find a new place to live.  The state fire investigator determined that the fire had begun at an electrical splice located in the attic.  The splice connected the house's original knob-and-tube wiring to more modern Romex wiring and was buried in cellulose insulation.  The investigator also noted tenants' use of multiple extension cords and supplemental wiring due to the insufficient number of functioning outlets.  The investigator concluded that the fire was caused by a combination of the load on the older electrical system, the moisture from the cellulose insulation, and the inability of the knob-and-tube wiring to shed heat due to it being buried in the insulation.

¶ 6.    Three years later, on December 14, 2011, the Timothy and Penny Terry, along with their two children and a grandchild, filed a twenty-four-page complaint against landlords in the civil division of the superior court.  They alleged: (1) breach of the oral rental agreement; (2) breach of the warranty of habitability, as set forth in 9 V.S.A. § 4457; (3) breach of the covenant of quiet enjoyment, in violation of 18 V.S.A. § 122(a) with respect to public health hazards; (4) violation of the Consumer Protection Act (CPA); (5) negligence; and (6) negligent infliction of emotional distress.  Tenants sought, among other things, compensatory, consequential, punitive, and exemplary damages, as well as attorney's fees.  Landlords counterclaimed for unpaid rent.

¶ 7.    A week long jury trial was held in May 2014.  After tenants rested, the trial court concluded that Timothy and Penny Terry had not presented sufficient evidence for the jury to award them economic damages but that they had presented sufficient evidence for the jury to award them, but not the other plaintiffs, damages for emotional harm stemming from the December 2008 fire.  Accordingly, the court dismissed the claims brought by all of the plaintiffs

3

except Mr. and Mrs. Terry. Moreover, the court collapsed tenants' first two counts into one claim of breach of the statutory warranty of habitability and dismissed their third and fourth counts claiming a breach of the covenant of quiet enjoyment and a violation of 18 V.S.A. § 122(a).

¶ 8. In the end, the trial court instructed the jury on only four of tenants' claims: (1) breach of the statutory warranty of habitability; (2) violating the CPA by renting a non-code-compliant residence; (3) committing negligent acts that caused the fire; and (4) negligently inflicting emotional distress on tenants because of the fire. The court further instructed the jury that it had determined as a matter of law that tenants' alleged injuries were restricted primarily to emotional suffering and other intangible injuries. The court also instructed the jury that landlords were alleging contributory negligence and seeking compensation for unpaid rent.

¶ 9. Following the jury charge, the trial court gave the jury special interrogatories to answer in reaching a verdict. In answering the special interrogatories, the jury concluded that: (1) landlords breached the warranty of habitability by renting tenants an unsafe or non-code-compliant residence; (2) the breach was a proximate cause of the intangible harms tenants claimed they suffered; (3) landlords did not act negligently; (4) landlords violated the CPA by renting to tenants an unsafe or non-code-compliant rental unit; (5) landlords' violation of the CPA was a proximate cause of the intangible harms tenants claimed they suffered; (6) landlords did not cause tenants to experience emotional distress by negligently exposing them to a risk of harm; (7) tenants' negligence was a proximate cause of the December 2008 fire, and their respective negligence as compared to that of landlords was thirty percent of the fault; (8) as compensation for the intangible injuries related to emotional distress, Penny Terry was entitled to $30,000 and her husband $10,000, to be reduced by the percentage of negligence assigned to them; (9) tenants were not entitled to recover any compensatory or exemplary damages as the

4

result of landlords' violation of the CPA; and (10) tenants owed landlords $20,000 in unpaid rent.

¶ 10. As the result of the jury's verdict, the trial court entered a final judgment that awarded Penny Terry $21,000 and Timothy Terry $7000, but made them jointly and severally liable to landlords in the amount of $20,000 for the unpaid rent. Both parties filed post-trial motions. The trial court denied landlords' motion for judgment as a matter of law as well as their motion for attorney's fees, but granted tenants' motion for judgment as a matter of law with respect to landlords' counterclaim and granted tenants an award of attorney's fees, albeit in an amount significantly less than they requested. Tenants had sought $133,630 in costs and attorney's fees, but the court ultimately awarded them $3830 in costs and $53,930 in attorney's fees. Regarding landlords' counterclaim for unpaid rent, the court determined that landlords were not entitled to any unpaid rent because the jury's verdict could be read as determining that they were in breach of the warranty of habitability and noncompliant with state or city regulations between December 2005 and December 2008, the period for which the $20,000 awarded to landlords was due.

¶ 11. Landlords' general claims of error on appeal are that: (1) the trial court's jury instructions misled the jury on tenants' habitability and CPA claims, resulting in prejudice to landlords; (2) the court erred by vacating the jury's unpaid-rent award in its post-judgment order; and (3) the court abused its discretion by awarding tenants attorney's fees on their habitability and CPA claims and by denying landlords' attorney's fees based on tenants' contributory negligence.

## II. Warranty of Habitability

¶ 12. We begin with landlords' challenges to the trial court's jury instructions. Landlords first argue that the trial court misled led the jury to their detriment by instructing the jurors to disregard, with respect to latent defects, the statutory notice requirement contained in

5

9 V.S.A. § 4458(a). Section 4458(a) sets forth remedies available to tenants when landlords fail to comply with habitability obligations "after receiving actual notice" of a noncompliance that materially affects health and safety. According to landlords, the plain language of § 4458(a), as amended, requires actual notice to the landlord before a tenant can recover for a violation of the statutory warranty of habitability, irrespective of whether the alleged defect is patent or latent. Landlords contend that the trial court's instruction prejudiced them because the evidence unequivocally demonstrated that they had no notice of the latent wiring defect that led to the fire and tenants' alleged intangible injuries.

¶ 13. The statutory warranty of habitability provides as follows: "In any residential rental agreement, the landlord shall be deemed to covenant and warrant to deliver over and maintain, throughout the period of the tenancy, premises that are safe, clean, and fit for human habitation and which comply with the requirements of applicable building, housing and health regulations." 9 V.S.A. § 4457(a). The statute further provides that a tenant who proves that a landlord has failed to comply with the warranty within a reasonable period of time "after receiving actual notice . . . from the tenant, a governmental entity or a qualified independent inspector" of a noncompliance that "materially affects health and safety . . . may: (1) withhold the payment of rent for the period of noncompliance; (2) obtain injunctive relief; (3) recover damages, costs and reasonable attorney's fees; and (4) terminate the rental agreement on reasonable notice." Id. § 4458(a).

¶ 14. Based on these provisions, the trial court instructed the jury that the statutory warranty of habitability requires, with respect to "defects which are open and apparent to the tenants themselves," (1) that the defects must have "materially affected the health and safety" of the tenants; and (2) that "either the tenants or some governmental agency or independent inspector must have given actual written notice of the defect or problem to the landlord/owner before the tenant can bring suit against the landlord/owner to recover money damages for that

6

alleged violation." The court further instructed the jury that it had determined as a matter of law that the "statutory prerequisites" had not been satisfied by the evidence presented, except for: (1) tenants' inability after May 2008 to use the basement boiler for heat or hot water; and (2) any noncompliance with electrical code requirements that may have contributed to causing the December 2008 fire. Thus, with regard to inadequate heat from the boiler or an insufficient number of electrical outlets, the court charged the jury that tenants were required to prove that landlords had received actual written notice of these deficiencies from them.

¶ 15. The trial court further charged the jury, however, that with regard to whether "the connection of more modern electrical wiring to the older 'knob and tube' wiring" violated applicable state or city regulations, "that would be a so-called 'latent' or non-obvious defect which [tenants] would not be required to give prior actual notice of to [landlords]." Accordingly, the court instructed the jury that even if it found that landlords "also were not aware of or had no actual notice from any other source that this problem or noncompliance with code existed, [landlords] could still be liable for breach of the statutory warranty of habitability, which requires absolute compliance with all applicable codes and health and safety regulations," as long as the tenants "have established by a preponderance of the evidence that the defect existed and was not in compliance with applicable code requirements." Landlords objected to this instruction, arguing that the statute required actual notice to them of an alleged defect that affected habitability.

¶ 16. We agree with landlords that the challenged instruction is inconsistent with Vermont law and was prejudicial to them. See DeYoung v. Ruggiero, 2009 VT 9, ¶ 36, 185 Vt. 267, 971 A.2d 627 (stating that this Court reviews trial court jury instructions to determine whether they "convey the true spirit and doctrine of the law" (quotation omitted)). The question of whether "latent" defects require actual notice was addressed by this Court in Willard v. Parsons Hill P'ship, 2005 VT 69, 178 Vt. 300, 882 A.2d 1213. In Willard, the plaintiffs alleged

7

a breach of the "common-law warranty of habitability," id. ¶ 1, which this Court had recognized in Hilder v. St. Peter two years before the statutory warranty of habitability became law as part of the Residential Rental Agreements Act (RRAA). 144 Vt. 150, 159, 478 A.2d 202, 208 (1984) (holding that there exists in any oral or written lease of residential units "an implied warranty of habitability . . . that the landlord will deliver over and maintain, throughout the period of the tenancy, premises that are safe, clean and fit for human habitation"). The central issue in Willard was whether the Legislature's enactment of the RRAA preempted the common-law warranty of habitability. Although we recognized "that the RRAA's overriding purpose was to codify the common-law relationship between landlords and tenants," Willard, 2005 VT 69, ¶ 26, and that the habitability provision had been enacted partly in response to Hilder, id. ¶ 16, we held in a 3-2 decision that the statute could not logically be applied to bar the plaintiffs' claims based on latent defects, id. ¶ 13.

¶ 17. Critical to the instant case, however, is the fact that Willard concerned a habitability defect that was latent only in the sense that it was not known to the plaintiff tenants—and thus the tenants had no opportunity to provide actual notice of the defect to the landlord. The defect was known to the landlord, however. In fact, governmental entities had made the landlord aware of the defect during a period of years before the tenants became aware of the defect. Although at the time of the Willard decision the habitability provision of the RRAA had already been amended to its current version requiring that a landlord be notified of an alleged habitability defect by either "the tenant, a governmental entity or a qualified independent inspector," § 4458(a), the earlier version of the statute requiring notice only by the tenants applied to that case.

¶ 18. The majority in Willard reasoned that the notice provision in the earlier version of § 4458(a) could not logically be understood to apply "in cases involving latent defects of which the landlord had written notice from someone other than the tenant." 2005 VT 69, ¶ 20

8

(emphasis added); see also id. ¶ 21 ("[I]mposing a notice requirement in a latent defect case where the landlord already knows what the problem is serves no purpose." (emphasis added)). We stated that "Hilder permitted suits for warranty breaches resulting from unrepaired or uncorrected defects that the landlord actually knew of," noting that allegations of the Willard tenants fit within that category. Id. ¶ 15 (emphasis in original). We opined that in enacting the earlier version of § 4458(a), the Legislature had not focused "on the aspect of Hilder allowing for tenant remedies in cases involving latent defects already known to the landlord." Id. ¶ 23 (emphasis added). We declined to find that the earlier version of § 4458(a) preempted the common law because the manifest purpose of the statutory notice provision is "to ensure that landlords are not held liable for contract damages because of breaches of the warranty of habitability of which they were not aware, and thus had no opportunity to timely cure." Id. ¶ 26 (emphasis added). Thus, we concluded that the earlier version of the statute could not be applied to preclude the tenants' claims in that case because "its notice provision, which serves an obvious and important purpose of protecting landlord rights in patent habitability defect cases, has no discernible purpose in latent defect cases where landlords already have actual written notice of a habitability problem from someone other than a tenant." Id. ¶ 27 (emphasis added). Further, we concluded more generally "that the RRAA's [earlier] enactment did not preempt common-law warranty of habitability actions involving latent defects of which a landlord already had actual knowledge." Id. (emphasis added).

¶ 19. Whether the amended (and current) version of § 4458(a) preempted the common law implied warranty of habitability was not at issue in Willard, but we stated in Willard that "[w]ith this amendment, the Legislature has now brought cases like plaintiffs' within the ambit of the statute." Id. ¶ 24. Moreover, none of the reasoning of the Willard majority supporting its determination that the earlier version of 4458(a) did not preempt the common-law implied warranty of habitability has any force in the instant case. This is particularly evident in

9

examining Hilder itself, wherein the common-law implied warranty of habitability was established. Although we noted in Hilder that "the implied warranty of habitability covers all latent and patent defects," 144 Vt. at 160, 478 A.2d at 208, we stated that "to bring a cause of action for breach of an implied warranty of habitability, the tenant must first show that he or she notified the landlord of the deficiency or defect not known to the landlord and [allowed] a reasonable time for its correction," id. at 161, 478 A.2d at 209 (quotation omitted). Later in the opinion, in discussing damages, we reiterated that "[t]he tenant must show that: (1) the landlord had notice of the previously unknown defect and failed, within a reasonable period of time, to repair it; and, (2) the defect, affecting habitability, existed during the time for which rent was withheld." Id. at 162-63, 478 A.2d at 210.[1]

¶ 20. In short, the language of the current statutory warranty of habitability reflects the parameters of the common-law warranty as adopted in Hilder and expanded in Willard. Although statutory law does not supplant common law by doubtful implication, "the common law is impliedly repealed by a statute which . . . undertakes to revise and cover the whole subject matter." E.B. & A.C. Whiting Co. v. City of Burlington, 106 Vt. 446, 464, 175 A. 35, 44 (1934). In any event, we need not determine in this case whether anything remains of the common-law warranty of habitability following the 2000 amendment to § 4458(a), insofar as tenants sought relief under the warranty pursuant to the statute, and that is how the trial court presented their habitability claim to the jury.

¶ 21. Moreover, there is no basis to remand the matter for a determination of whether landlord had actual notice of the habitability defect that led to tenants' claims associated with the

---

[1] In Hilder, we recognized that our adoption of a common law warranty of habitability, while not "an abrupt change in Vermont law," 144 Vt. at 159, 478 A.2d at 208, was in derogation of the prior common law doctrine of caveat lessee—"that is, the tenant took possession of the demised premises irrespective of their state of repair." Id. at 157, 478 A.2d at 207. This fact puts into context why the warranty is limited, as indicated above, in a way that insulates from liability landlords who are often in the best position to prevent and insure against latent defects from liability.

2008 fire. Tenants have not challenged the following statement in the trial court's post-judgment decision: "It is conceded, and the court concurs that the evidence at trial established that [landlords] did not receive any actual or written notice prior to the 12/15/08 fire, from [tenants] or from any governmental agency, or any other source, about the existence of [the] wiring defects" where the fire originated. See 9 V.S.A. § 4451(1) (stating that term "Actual notice" as used in chapter "means receipt of written notice hand-delivered or mailed to last known address). Indeed, tenants argue on appeal—in connection with their contention that the trial court did not err by vacating the jury's award of unpaid rent—only that constructive notice on the part of landlords could be inferred from evidence suggesting that during the time landlords owned the property, electricians made the splice in the attic that violated code.[2] Because there is no evidence that landlords had actual notice of a habitability defect that led to the fire, tenants' statutory habitability claim fails as a matter of law.

¶ 22. Landlords also argue, with respect to the trial court's habitability instruction, that the court improperly merged tort and contract concepts by directing the jury to consider whether tenants' claimed injuries were proximately caused by any habitability violations that they proved. According to landlords, this instruction violated the principle set forth in Favreau v. Miller, 156 Vt. 222, 229-30, 591 A.2d 68, 73 (1991), and reinforced in Weiler v. Hooshiari, 2011 VT 16, ¶¶ 9-10, 189 Vt. 257, 19 A.3d 124, that the warranty of habitability does not extend to

_____

[2] Tenants do not contend, however, that landlords knew, or even that they should have known, of the electrical problems that led to the 2008 fire. Moreover, they argue only that: (1) the trial court's determination, "as a matter of law, that statutory notice does not apply to latent defects . . . . comports with Willard"; and (2) the habitability statute invokes strict liability. We reject both arguments above. They do not argue that the statutory (or, for that matter, common law) warranty of habitability should apply in situations where a landlord who did not receive actual notice of a habitability defect should have known of the defect. Cf. Restatement (Second) of Property, Landlord & Tenant § 5.1 cmt. d (stating that landlord has reasonable time to remedy unsuitable condition of premises before tenant's entry if landlord can establish that he or she "was unaware of, and with due diligence could not have known of, the condition which would otherwise entitle the tenant" to terminate lease or obtain equitable and legal relief). Thus, that issue is not before us.

personal injuries covered by tort law. Landlords' argument appears to be aimed at the nature of the alleged damages as restricted by the trial court, but landlords did not object at trial—nor do they do so here directly—to the "intangible mental suffering and emotional distress damages" claimed by tenants and allowed by the court in the context of tenants' habitability and CPA claims. Rather, landlords take an indirect approach by claiming error in the court applying a tort element—proximate cause—to tenants' claimed habitability damages.

¶ 23.    We decline to consider this argument because it was not properly preserved at trial. At the beginning of the charge conference, the trial court invited a discussion about its proposed instructions but cautioned the attorneys that "the real time to make yourself heard is after the Court actually delivers the charge and you have to formalize your objections on the record at that time." As the court stated to the attorneys: "that's what really counts." At one point during the charge conference, landlords indicated that the court had mixed up the negligence claim, which was grounded in tort law, and the habitability claim, which was grounded in contract law, citing in particular the instruction requiring the element of proximate cause for the habitability claim. When the court asked whether the attorney wanted an instruction that did not require tenants to prove proximate cause, the attorney responded, "[n]o, on the contrary," and then focused on his argument that the habitability statute required actual written notice.

¶ 24.    Following the trial court's charge to the jury, landlords stated three ongoing objections. Regarding the only objection relevant to this argument, landlords generally argued that the court's habitability instruction improperly merged the habitability contract claim and the negligence tort claim, but specifically referred only to the habitability statute's requirements that there be "written notice from the tenant or a government entity of an obvious defect" and that the landlord have "actual knowledge of a latent defect." Thus, landlords did not preserve a specific objection to the "proximate cause" element in the habitability instruction or to the nature of the

12

damages allowed by the trial court with respect to the habitability and CPA claims. See V.R.C.P. 51(b) (requiring party to object to jury instruction "before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection"); Straw v. Visiting Nurse Ass'n & Hospice of VT/NH, 2013 VT 102, ¶ 13, 195 Vt. 152, 86 A.3d 1016 (concluding that plaintiff's brief post-instruction objection did not satisfy Rule 51(b) in that it merely referred to previous objections in charge conference and did not state distinctly matter objected to or grounds for objection).

### III. Consumer Protection Act

¶ 25. We now turn to landlords' challenge to the trial court's instruction on the CPA. In relevant part, the trial court instructed the jury as follows:

> Under the [CPA], a landlord/owner commits a deceptive practice whenever it rents out any residential premises which are not then in compliance with any applicable health and safety regulations or any applicable building or electrical code. It is not required that the landlord-owner have actual knowledge, or actual notice of the noncompliance with the applicable code or regulation. It is not required that the landlord/owner make any actual misstatements or misrepresentations in connection with the rental premises which are non-compliant; it is the act of renting a non-compliant residence to another which is the deceptive practice.

Landlords contend that this instruction was erroneous and prejudicial because, for tenants to prevail on their CPA claim, Vermont law requires that they prove that landlords were aware of any noncompliance with substantive code violations when they rent residential premises to tenants.

¶ 26. We agree that the trial court's instruction with respect to tenants' CPA claim was overly broad in defining what constitutes a deceptive act, and that the instruction resulted in prejudice to landlords. The instruction is overbroad in two respects—in not including the element of materiality in defining a deceptive act, and in not requiring that landlords knew or

13

should have known of the alleged defect that they failed to disclose and that led to the 2008 fire. Before discussing the erroneous instruction in detail, we review our law concerning the CPA.

¶ 27.   A consumer who contracts for products or services in reliance upon, or who sustains an injury as a result of, fraudulent representations prohibited by 9 V.S.A. § 2453 may bring an action under the CPA.  9 V.S.A. § 2461(b).  Section 2453(a) declares that "unfair or deceptive acts or practices" are unlawful.  In Bisson v. Ward, we held that the CPA applies to residential landlord-tenant transactions, 160 Vt. 343, 349-50, 628 A.2d 1256, 1260-61 (1993),[3] and that the landlords in that case committed a deceptive act by renting an apartment without obtaining a certificate of occupancy and knowing that the apartment was in violation of health and safety codes, id. at 351, 628 A.2d at 1261.

¶ 28.   In a prior case, we adopted, in relevant part, the following test as to what constitutes a deceptive act: (1) there must be a representation or omission likely to mislead the consumer; (2) the consumer must be interpreting the representation or omission reasonably under the circumstances; and (3) the misleading effects of the representation or omission must be "material," that is likely to affect the consumer's conduct or decision with respect to the product or service offered.  Peabody v. P.J.'s Auto Village, Inc., 153 Vt. 55, 57, 569 A.2d 460, 462 (1989).  Earlier, in Winton v. Johnson & Dix Fuel Corp., we held that intent to deceive or bad faith is not required for there to be liability under the CPA.  147 Vt. 236, 243, 515 A.2d 371, 376 (1986).

---

[3]   We pointed out in Bisson that "[c]ourts in other jurisdictions have also concluded that their consumer protection statutes apply to the landlord-tenant relationship."  160 Vt. at 350, 628 A.2d at 1261.  We note that some courts in other jurisdictions have held otherwise.  See, e.g., Carlie v. Morgan, 922 P.2d 1, 6 (Utah 1996) (concluding that state consumer-protection law "does not provide a remedy in the instant case where plaintiffs are seeking damages caused by the uninhabitable condition of their apartments"); State v. Schwab, 693 P.2d 108, 113-14 (Wash. 1985) (holding that residential landlord-tenant problems are within exclusive purview of Residential Landlord-Tenant Act, and that violations of that Act do not constitute violations of Consumer Protection Act).

¶ 29. In Carter v. Gugliuzzi, which concerned a suit against a real estate agent, we cited Winton, not only for the proposition that "lack of intent to deceive or good faith are not defenses under" the CPA, but also for the proposition that "[t]he absence of intent based upon a lack of knowledge or expertise is not a defense to a claim under the Act." 168 Vt. 48, 58, 716 A.2d 17, 24-25 (1998). In Winton, however, we made no mention of the latter proposition, and in fact expressly rejected the notion that the statute created strict liability regardless of fault, stating that the fault lies "in publishing a false or misleading statement," irrespective of any "intent to mislead." 147 Vt. at 244, 515 A.2d at 376. Carter neither cited any other law nor gave any further explanation for the latter proposition. Since Carter, we have repeated, without further analysis, the latter proposition rejecting lack of knowledge as a defense under the CPA. See Gregory v. Poulin Auto Sales, Inc., 2012 VT 28, ¶ 14, 191 Vt. 611, 44 A.3d 788; L'Esperance v. Benware, 2003 VT 43, ¶ 15, 175 Vt. 292, 830 A.2d 675.

¶ 30. In Poulin, the operator of an automobile dealership represented that an auctioned vehicle's title was clear and erroneously certified an odometer reading without disclosing to the buyer that he "made no observations or investigation of the vehicle or its title, had not inspected or driven the vehicle, and had not confirmed the odometer reading it certified." 2012 VT 28, ¶ 13. We determined that a seller cannot "immunize itself from [CPA] liability by remaining ignorant of information it has a duty to disclose, particularly where it fails to directly and specifically bring the limits of its knowledge regarding the possibility of title and odometer discrepancies to the attention of the buyer." [4] Id. ¶¶ 11, 16.

¶ 31. In L'Esperance, which involved water contamination in a residential rental property, we quoted Carter for the principle that a deceptive act did not require knowledge of the

---

[4] In this sense, the case is similar to Carter, which concerned a real estate agent whose duty consisted "precisely of acquiring and conveying information" about conditions in the neighborhood and property, 168 Vt. at 55, 716 A.2d at 23, and who could therefore reasonably be held to have constructive knowledge of those conditions.

15

deception. 2013 VT 43, ¶ 15. We also noted, however, that the "landlord had knowledge of the possibility of contamination based on past experiences with the water supply at the property," id. ¶ 10, and further that landlord "did not present to the [trial] court any specific facts or evidence contradicting [an] affidavit and report" indicating that: (1) the Department of Labor and Industry had sent landlord a report denying occupancy until an inspection was done; and (2) a later inspection revealed serious structural deficiencies with respect to the property. 2013 VT 43, ¶¶ 14-15.

¶ 32. Similarly, in other cases both before and after Carter we have suggested that knowledge on the part of defendants is significant in determining their liability under the CPA. Indeed, in Bisson, as noted, we detailed the multiple notices that landlords had received from both the tenants and the Department of Labor and Industry concerning the serious structural and mechanical defects with the property, including the lack of hot water and heat during the winter. 160 Vt. at 344-45, 628 A.2d at 1257. In finding a deceptive act based on the rental of the apartment, we repeatedly emphasized landlord's knowledge of those defects. Id. at 351, 628 A.2d at 1261; see also Vastano v. Killington Valley Real Estate, 2007 VT 33, ¶ 8, 182 Vt. 550, 929 A.2d 720 (concluding that "materiality" of deceptive act was satisfied by homebuyers because property manager and listing agent knew of but failed to disclose fact that there was ongoing underground testing on property due to prior gasoline spill and contamination).

¶ 33. We now return to the trial court's instruction on the CPA. As indicated above, the trial court instructed the jury that tenants Penny and Timothy Terry were entitled to damages under the CPA based on landlords' deceptive act if tenants proved by a preponderance of the evidence that landlords rented them premises that were "not then in compliance with any applicable health and safety regulations or any applicable building or electrical code." If this were the law, one could argue, given the detailed specifications of housing codes and regulations, that virtually every rental of residential property in the state would involve a

16

deceptive act subject to liability and damages, including attorney's fees, under the CPA. We conclude, however, that the trial court's instruction was too broad.

¶ 34. The instruction was too broad first and foremost because it failed to apprise the jury that the allegedly deceptive act, which was based on landlords' alleged violation of the warranty of habitability contained in § 4457(a) of the RRAA, had to be "material" in the sense that it was likely, from an objective viewpoint, to have impacted tenants' decision to rent the premises. See Carter, 168 Vt. at 56, 716 A.2d at 23 ("Materiality is . . . generally measured by an objective standard, premised on what a reasonable person would regard as important in making a decision . . . ."). We recognize that the warranty of habitability stated in § 4457(a) provides that residential landlords warrant safe and clean premises that are fit for human habitation and that "comply with the requirements of applicable building, housing, and health regulations." Nevertheless, a CPA claim based on a violation of the warranty of habitability, like all claims under the CPA, asserts an unfair or deceptive act, which contains an element of materiality. Peabody, 153 Vt. at 57, 569 A.2d at 462. This mandatory element of the CPA coincides with the remedy provision of the habitability statute, which requires that any noncompliance with habitability obligations "materially affect[] health and safety." 9 V.S.A. § 4458(a). Although we made the general statement in Bisson that landlords commit "a deceptive act by renting an apartment that was in violation of law," 160 Vt. at 351, 628 A.2d at 1261, that statement must be read in the context of its acknowledgment in the same paragraph that a deceptive act "is a material representation, practice or omission likely to mislead a reasonable consumer," id.

¶ 35. The trial court's instruction on the CPA was also too broad in the sense that it effectively imposed liability on landlords for their failure to disclose code violations, without regard to whether they had any knowledge of the alleged violations. The instruction in this regard is certainly understandable given the mixed messages in the relevant case law. But, as

17

indicated above, though we have made general statements about knowledge not being required to support a CPA claim, we have done so for the most part in the context of cases in which the defendants were aware of material defects not revealed to the consumers. Indeed, in <u>Bisson</u> itself, the case in which we held that the CPA "applies to landlord-tenant transactions," <u>id</u>. at 351, 628 A.2d at 1261, we repeatedly pointed out that landlords knew of material deficiencies in the rental premises affecting health and safety but failed to inform the tenants of those deficiencies, thereby impliedly representing that the premises was in compliance with the law in all material respects affecting habitability. <u>Id</u>. at 351, 628 A.2d at 1261; see also <u>L'Esperance</u>, 2013 VT 43, ¶¶ 10, 14-15 (stating that landlord knew of possibility of water contamination and did not contest evidence at trial indicating same); cf. <u>Vastano</u>, 2007 VT 33, ¶ 8 (concluding that listing agent's knowledge of underground testing due to gasoline spill on property satisfied materiality element of deceptive act under CPA).

¶ 36. While all jurisdictions agree that intent to deceive is not an element of a CPA claim, they are divided on whether, particularly concerning omissions as opposed to misrepresentations, knowledge or awareness on the part of defendants must be shown.[5] See C. Carter & J. Sheldon, Unfair and Deceptive Acts and Practices § 4.2.5.1, at 210-11 (8th ed. 2012) (stating that courts have found that knowledge of statement's falsity is not necessary element for finding deception, but "[s]ome courts find agents or sellers not liable for failing to disclose facts they do not know," as opposed to making affirmative representations); <u>id</u>. § 4.214.3.4 (stating that some jurisdictions, either by statute or by court decision, require that omissions, as opposed to affirmative representations, be knowing because "sellers need not disclose information they do not know and should not have known"); see, e.g., <u>Nei v. Burley</u>, 466 N.E.2d 674, 679-80 (Mass.

_____

[5] In consumer-fraud actions brought by the Federal Trade Commission (FTC), as opposed to state consumer-protection actions brought by private parties, the FTC need not show knowledge in finding entities liable, but, before finding individuals liable, must show that "the individual had or should have had knowledge or awareness of defendants' misrepresentations." <u>Fed. Trade Comm'n v. Freecom Commc'ns, Inc.</u>, 401 F.3d 1192, 1207 (10th Cir. 2005).

1983) (affirming rejection of homebuyers' consumer-protection-act complaint because there was no evidence that real estate broker knew or should have known about subject property's wetness problems); Robinson v. Preston Chrysler-Plymouth, Inc., 633 S.W.2d 500, 502 (Tex. 1982) (recognizing "distinction between misrepresentations and failure to disclose information" and ruling "that one cannot be held liable under the [consumer-protection act] for failure to disclose facts about which he does not know").

¶ 37.    These courts have been reluctant to impose what amounts to strict liability with regard to consumer-protection claims absent a clear legislative intent to do so.  See Kelton v. Hollis Ranch LLC, 927 A.2d 1243, 1246 (N.H. 2007) ("The trial court properly construed the legislature's use of the words 'deceptive' and 'unfair' as requiring a degree of knowledge or intent."); State v. Autozone, Inc., 258 P.3d 289 (Ariz. Ct. App. 2011) (vacated on other grounds) (noting that statutes will be construed as imposing strict liability only if there is clear legislative intent to do so, and stating that "the remedial purposes" of the consumer-fraud act cannot "transform the statutory provision into one of strict liability"); cf. State v. Bourn, 2012 VT 71, ¶ 10, 192 Vt. 270, 58 A.3d 236 ("When the Legislature is silent as to the mens rea required for a particular offense, this Court will not simply assume that the statute creates a strict liability offense, but will try to determine the intent of the Legislature." (quotations omitted)).  The courts reason, with respect to omissions, that there can be "no liability for failing to disclose what a person does not know."  Underwood v. Risman, 605 N.E.2d 832, 835 (Mass. 1993) ("The notion of disclosure necessarily implies that the fact in question is known to the person expected to disclose it." (quotation omitted)).

¶ 38.    We agree with this reasoning and hold that, in cases where tenants are basing a CPA claim upon the failure of landlords to disclose code violations related to the habitability of residential premises, the tenants must show that the landlords knew or should have known of the alleged defect in the premises.  See Dwyer v. Skyline Apartments, Inc., 301 A.2d 463, 467 (N.J.

19

Super. Ct. App. Div. 1973) (refusing to apply strict liability to landlord-tenant relationship with respect to latent defect unknown and unknowable to landlord). Nothing in the CPA evinces a legislative intent to make landlords strictly liable under the Act for having failed to reveal every potential latent defect in residential premises. See P. Neisser, The Tenant As Consumer: Applying Strict Liability Principles to Landlords, 64 St. John's L. Rev. 527, 527 (1990) (noting that few courts "have adopted strict liability" with respect to landlord-tenant transactions). Moreover, requiring knowledge on the part of landlords for their failures to disclose defects or code violations in residential housing is more consistent with the actual notice requirement of the RRAA's habitability provision, which often forms the basis for claims under the CPA.

¶ 39. We emphasize, however, that landlords may be held liable for not revealing material defects or code violations of which they should have been aware. They may not avoid liability by intentionally remaining ignorant of information that they have a duty to disclose, particularly if they fail to inform tenants of the limits of their knowledge with respect to that information. See Gregory, 2012 VT 28, ¶¶ 11, 13 (finding auto dealer liable under CPA where he represented vehicle's title was clear and certified odometer reading without disclosing that he had made no investigation as to title and had not confirmed odometer reading he had certified). We further emphasize that tenants can establish through circumstantial evidence alone that landlords knew or should have known of a code violation or other defect impacting habitability. See C. Carter & J. Sheldon, supra, § 4.2.5.2, at 212 ("Knowledge may also be established by circumstantial evidence."); cf. State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1998) ("Intent is rarely proved by direct evidence; it must be inferred from a person's acts and proved by circumstantial evidence.").

¶ 40. Because the trial court's CPA instruction was overly broad and prejudicial to landlords, we must vacate the jury's determination that landlord violated the CPA. On the record before us, however, we cannot conclude as a matter of law whether landlords knew or should

20

have known of the electrical splice that led to the fire. The trial court indicated in its post-judgment decision that there was evidence at trial that the splice in the attic contributing to the 2008 fire was more likely than not done at the same time landlords had hard-wired smoke detectors installed in the Old North End property. **Pc 2, 9**. Therefore, the matter must be remanded for retrial of tenants' CPA claim.

## IV. Unpaid Rent

¶ 41. Landlords also argue that the trial court erred in its post-judgment order by vacating the jury's award of $20,000 in unpaid rent pursuant to their counterclaim. Landlords contend that the post-judgment ruling should be reversed because: (1) tenants' failure to pay rent was not connected to the defect in the house upon which their habitability claim and damage award was based; (2) the ruling disregards the habitability statute's requirement that a tenant prove notice, failure to repair, and materiality before being entitled to withhold rent; and (3) the ruling was based on clearly erroneous factual findings concerning the premises' furnace and hard-wired smoke detectors.

¶ 42. The trial court's ruling must be reversed because of our vacation of the jury's verdict in favor of tenants with respect to their statutory warranty-of-habitability claim. Absent their habitability claim, there is no basis for tenants to withhold rent. Therefore, the jury's verdict regarding unpaid rent must stand.[6]

---

[6] We further note, as the trial court pointed out, that during trial tenants did not articulate their post-verdict theory that they were not obligated to pay any rent at all because the premises was never fully compliant with local and state regulations. At the close of evidence, tenants sought a directed verdict on landlords' counterclaim, but only on the basis that landlords presented insufficient evidence as to the amount of unpaid rent. Tenants did not object to the trial court's instructions that, with respect to landlords' counterclaim, tenants had to establish, through an affirmative defense, that they withheld rent because: (1) the premises was not in compliance with the warranty of habitability or with applicable safety codes or regulations; and (2) landlords were given written notice of the noncompliance but failed to remedy the situation. Having failed to object to these instructions, tenants waived any post-verdict argument that they did not have to pay any rent during any period of noncompliance irrespective of whether they or landlords were aware of the noncompliance or whether rent was withheld due to the

21

## V. Attorney's Fees

¶ 43. Finally, landlords argue that the trial court abused its discretion by: (1) awarding attorney's fees to tenants based on their habitability and CPA claims, and (2) denying their motion for attorney's fees based on tenants' contributory negligence.

¶ 44. Given our vacation of the jury's award of damages on tenants' habitability and CPA claims, and our remand of the CPA claim, we vacate the trial court's award of attorney's fees to tenants. In light of our resolution of this appeal, we address, with respect to the attorney's fees awarded to tenants, only landlords' contention that tenants were not entitled to attorney's fees on their CPA claim because the jury did not award any damages based on that claim. See Anderson v. Johnson, 2011 VT 17, ¶ 9, 189 Vt. 603, 19 A.3d 86 (mem.) (stating that "where an award of attorney's fees has been held to be mandatory, the plaintiff is generally required to have suffered some adverse effect or have demonstrated some injury of a personal or public nature warranting some sort of relief"). We point out only that the damages tenants sought for both their habitability and CPA claims were the same; thus, the jury apparently did not award damages for the CPA violation because of the trial court's admonition not to award tenants the same damages for separate counts. The jury had already awarded tenants the same damages for the habitability claim, and had concluded that both the habitability and CPA claims proximately caused tenants' intangible injuries. Thus, based on the jury verdict, the trial court could have awarded attorney's fees for the CPA claim. Cf. Kwon v. Eaton, 2010 VT 73, ¶ 18, 188 Vt. 623, 8 A.3d 1043 (rejecting argument that tenants were not entitled to attorney's fees on CPA claim for which jury awarded no damages, insofar as jury had awarded damages on their habitability claim, and "there was a clear overlap between the damages elements claimed for breach of the lease, breach of warranty, and consumer fraud").

---

noncompliance. Ferrisburgh Realty Investors v. Schumacher, 2010 VT 6, ¶ 27, 187 Vt. 309, 992 A.2d 1042 (concluding that cross-appellant failed to preserve legal issue raised for first time in post-trial motion following jury verdict).

¶ 45.    Regarding landlords' appeal of the trial court's refusal to award them attorney's fees, landlords' only argument before the trial court and here on appeal is that they are entitled to attorney's fees under 9 V.S.A. § 4456(e) because tenants violated § 4456(a) by "contribut[ing] to the noncompliance of the dwelling unit with applicable provisions of building, housing, and health regulations."  The trial court concluded that landlords were not entitled to attorney's fees under § 4456(e), reasoning that, although tenants' use of electric space heaters and multiple extension cords may have contributed to the 2008 fire, there was no evidence that those actions violated any code or regulation or contributed to landlords' noncompliance with the applicable electrical code with regard to the attic splice, which was the principal cause of the fire.  We agree with this reasoning and thus affirm the trial court's denial of attorney's fees on the grounds asserted by landlords.

The jury verdict is vacated except for the award of unpaid rent; the trial court's post-judgment order is reversed; and the matter is remanded for proceedings consistent with this Court's opinion.

FOR THE COURT:

_____
Chief Justice